# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 19, 2010

## STATE OF TENNESSEE v. PAUL ALEXANDER MONTGOMERY, III

**Appeal from the Circuit Court for Marshall County**
**No. 09-CR-17     Robert G. Crigler, Judge**

---

**No. M2009-02610-CCA-R3-CD - Filed March 31, 2011**

---

The Defendant, Paul Alexander Montgomery, III, was convicted of nine counts of rape of a child, a Class A felony. See Tenn. Code Ann. § 39-13-522. In this appeal as of right, the Defendant contends that (1) the evidence was insufficient to sustain the convictions of rape of a child and (2) the trial court erred by admitting evidence in violation of Tennessee Rules of Evidence 403 and 404(b). Following our review, we reverse the judgments of the trial court and remand the Defendant's case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are
Reversed; Case Remanded.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Donna Orr Hargrove, District Public Defender; Michael Jonothan Collins, Assistant Public Defender (at trial); William Joseph Harold, Assistant Public Defender (at trial); and Gregory D. Smith, Clarksville, Tennessee (on appeal), for the appellant, Paul Alexander Montgomery, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

*I. Pretrial Proceedings*

The Defendant was indicted on three counts of aggravated sexual battery[1] and nine counts of rape of a child. See Tenn. Code Ann. §§ 39-13-504, -522. According to the indictment, all of the charges stemmed from three incidents occurring "on or about a date in September 2003," "on or about a date in December 2004," and "on or about a date between April 1, 2005 to May 31, 2005." The indictment alleged that in September 2003, the Defendant and the victim, D.C.,[2] engaged in sexual activity during which the Defendant had D.C. perform fellatio on him, the Defendant performed cunnilingus on D.C., and the Defendant digitally penetrated D.C.'s vagina. The indictment also alleged that in December 2004, the Defendant and D.C. performed fellatio and cunnilingus on each other at the same time and the Defendant digitally penetrated D.C.'s vagina. In April or May 2005, the indictment alleged that the Defendant had D.C. perform fellatio on him, the Defendant performed cunnilingus on D.C., and the Defendant penetrated D.C.'s vagina with his penis.

Prior to trial, the State filed a notice of its intent to use evidence of the Defendant's other crimes, wrongs, or acts pursuant to Tennessee Rule of Evidence 404(b). The State sought to introduce evidence that the Defendant had shown D.C. pornography, that the Defendant would ask D.C. what acts she wished to perform and in what order, that the Defendant told D.C. she was a potential wife, that the first sexual encounter between D.C. and the Defendant occurred on her ninth birthday in 2002, and that the Defendant and D.C. engaged in sexual activity, including the indicted occasions, between 10 and 25 times from 2002 to 2005. The trial court held a hearing on these issues prior to trial. At the hearing, D.C. testified that she and the Defendant engaged in sexual activity 10 to 25 times between 2002 and April 2005 and that except for her first sexual encounter with the Defendant and the indicted incidents, she could not remember the specific dates on which sexual activity occurred. D.C. also testified that on her ninth birthday, the Defendant took her to a mall and to see a movie before he checked into a hotel room where they engaged in sexual activity for the first time. D.C. testified in detail about this sexual encounter, but she testified she could not remember where this incident occurred. However, D.C. believed the incident occurred outside of Marshall county.

---

[1]Prior to trial, the prosecution and the defense entered into an agreed order stating that the three aggravated sexual battery charges alleging the Defendant engaged in cunnilingus with the victim were duplicitous with the rape of a child charges alleging the same. Therefore, the trial court ordered the aggravated sexual battery charges be merged with the rape of a child charges and the indictment be renumbered.

[2]This court refers to rape victims by their initials.

Following arguments by counsel, the trial court ruled that all of the evidence in the State's notice would be admissible at trial. Regarding the victim's testimony about how many times she and the Defendant engaged in sexual activity, the trial court reasoned "[i]f she says it happened . . . one time or 100 times, what difference does it make . . . [e]ther [the jury] believe[s] her or they don't." The trial court further reasoned that the evidence of Defendant's other wrongs "is not factually unrelated [to the charged crimes], . . . [i]t is connected with the relationship between the victim and the [D]efendant." The trial court ruled that the evidence of the Defendant's other wrongs was not being offered to show the charged conduct conformed with a character trait, but instead was offered "to tell the complete story in [this] case."

The court reasoned that "to tell the complete story, you have to – this is a stepfather and stepdaughter, it just would be illogical . . . to just talk about just these [charged] acts in isolation, in a vacuum, without some evidence of the relationship between the parties and what else was going on." The trial court reiterated that it felt the prejudicial effect of this evidence would not be great and would not outweigh the probative value because "it is all going to come down to [the victim's] credibility in the final analysis." The trial court also cited State v. Rickman, 876 S.W.2d 824 (Tenn. 1994), for the proposition that "when an indictment is not time specific, when the evidence relates to sex crimes [that] allegedly occurred during the time as charged in the indictment, [evidence of other wrongs is] admissible as long as" the State elects which particular offense or offenses it is seeking a conviction for.

## II. The State's Evidence

### A. The victim's testimony

At trial, D.C. testified that she was born on August 28, 1993, and that she was less than 13 years old at the time of the indicted offenses. D.C. testified that when she was nine years old she lived with her mother, her father, her sister, the Defendant, and a woman named Naomi Atkins in a trailer on the Defendant's property in Marshall county. At that time, D.C.'s mother and father were legally married. However, her mother was in a relationship with the Defendant, and her father was in a relationship with Ms. Atkins. D.C. testified that when she was nine years old, she would refer to the Defendant as "Daddy Paul." On her ninth birthday, the Defendant promised D.C. "[a] day out between us" as her birthday present. D.C. testified that the Defendant took her to a mall to go on a shopping trip and then took her to a movie theater in Columbia, Tennessee to see "Spirited Away."

Afterwards, the Defendant took D.C. to a hotel with a "[g]ravel driveway and parking lot[,] [p]ale yellow or cream colored siding[,] [a]nd green trim, shutters." D.C. testified that

once she was in the hotel room, the Defendant helped her take her clothes off before he took his clothes off, and then the Defendant took her hand and made her touch his penis. According to D.C.'s testimony, the Defendant moved her hand up and down his penis with his hand until he ejaculated. D.C. testified that until that day, she had never seen or touched a penis. D.C. also testified that while she was in the hotel room the Defendant kissed and licked her vagina and penetrated her vagina with his tongue. D.C. told the jury that at the time, she did not understand what had happened to her and she did not know that what the Defendant had done to her was wrong.

D.C. then testified that between her ninth birthday in 2002 and when she finally told the Defendant to stop his sexual advances in 2005, she had engaged in sexual activity with the Defendant between 10 and 25 times. D.C. told the jury that after she asked the Defendant to stop, he still attempted to try to engage in sexual activity with her. D.C. further testified that she tried to "suppress [her memories] and make them less potent." According to D.C., even though the Defendant was already in a relationship with her mother, she believed that she was in love with the Defendant and wanted him to be her boyfriend. D.C. told the jury that she did not "see anything wrong with that" because she lived in a house where her mother, her father, and their respective paramours all lived together.

D.C. testified that in September 2003 she went for a walk with the Defendant in a wooded area on the Defendant's property to "check on the fence line." D.C. told the jury that between 2002 and 2005, she and the Defendant had engaged in sexual activity in this wooded area "[f]our or five" times. D.C. testified that she remembered this specific sexual encounter with the Defendant because the Defendant told her "he was considering [her] as a potential wife" prior to the encounter. According to D.C.'s testimony, the Defendant told her that "to be considered for a potential wife, he had to ejaculate in [her] mouth and [she] had to swallow it." D.C. also testified that she knew this incident happened in September 2003 because it was close to her birthday "[j]ust like when [she] was nine." D.C. told the jury that she had performed fellatio on the Defendant before but that this was the only time he asked her to swallow his semen. D.C. further testified that she had been to the same clearing in the wooded area to engage in sexual activity with the Defendant and that she knew that when the Defendant took her to the clearing, that is what they were there for.

D.C. testified that once she and the Defendant got to the clearing, they took their clothes off before the Defendant performed cunnilingus on her, penetrating her vagina with his tongue. According to D.C.'s testimony, the Defendant then had her perform fellatio on him until he ejaculated in her mouth. D.C. told the jury that she could not swallow the semen and that she spat it out, upsetting the Defendant. The Defendant, according to D.C.'s testimony, "called [her] a toy" and told her that "toys have to feel pain." The Defendant then "[p]ushed his thumb into [her] vagina." D.C. testified that the Defendant had digitally

penetrated her vagina before but that this time was different because it hurt. After they left the clearing, the Defendant never said anything else to her about being a potential wife.

D.C. testified that in December 2004, around Christmas, the Defendant took her to a "vacant" house on his property. D.C. told the jury that she knew what she and the Defendant were going to do when they got to the house. D.C. further testified that no one was living in the house, it had almost no furniture in it, and was cold. At this point "in [her] relationship with Daddy Paul," D.C. had performed several different types of sexual acts with the Defendant and the Defendant would ask her what type of sex act she "wanted done" and in what order. D.C. testified that once she and the Defendant got to the "vacant" house, the Defendant turned on a heater and they took off their clothes. D.C. told the jury that she and the Defendant performed "[o]ral sex on each other at the same time in front of the heater" and that they had never done that before. D.C. also testified that the Defendant digitally penetrated her vagina while they were at the "vacant" house.

D.C. testified that in April or May 2005, the Defendant entered her bedroom sometime between 12:00 a.m. and 3:00 a.m. D.C. told the jury that this was not the first time she and the Defendant had engaged in sexual activity in her bedroom and that she knew the Defendant was coming to her room that night because he "talked about it the day before." The Defendant "quietly" closed the door behind him and D.C. took the comforter off her bed and spread it on the floor because her bed squeaked. D.C. told the jury she did not want anyone to catch her and the Defendant. D.C. testified that she and the Defendant took off their clothes and that she performed fellatio on the Defendant until he ejaculated. The Defendant then performed cunnilingus on D.C. After that, the Defendant put a condom on and penetrated her vagina with his penis. According to D.C.'s testimony, she stopped engaging in sexual activity with the Defendant sometime after this incident.

D.C. testified that at some point during the time she was engaging in sexual activity with the Defendant, the Defendant married her mother and became her step-father. On cross-examination, D.C. testified that there was a baby monitor in the hallway outside her room and on the night in April or May 2005 it was probably on. D.C. also admitted during cross-examination that she was living with her father in 2008 and that her father was engaged in a custody dispute with her mother over her younger sister a few weeks prior to D.C. bringing these allegations against the Defendant.

### B. Corroborating evidence

Beverly Cotton, a pediatric nurse practitioner with Our Kids clinic in Nashville, testified that she examined the victim on July 21, 2008. Ms. Cotton testified that the results of the victim's genital examination were normal. However, Ms. Cotton testified that most

children who report sexual abuse have normal genital examinations. Ms. Cotton testified that should could not confirm "whether sexual contact happened or not" and that "in most cases when there are not findings, it does not mean that nothing happened." Instead, Ms. Cotton testified, "[i]t just means that the child has a normal examination."

Naomi Atkins testified that she met the Defendant through a role playing gaming group in 2000. Ms. Atkins told the jury that in 2001, she began a sexual relationship with the Defendant and that on one occasion, she engaged in sexual activity with the Defendant and the victim's mother. Defense counsel objected to the relevancy of the State's questions on this matter. However, the trial court overruled the objection because the Defendant did not object "to some of the State's questions as to the goings on in this household." Ms. Atkins then testified that she later had a sexual relationship with the victim's father. Ms. Atkins testified that while she lived with the Defendant, he would talk "about wishing to found a church with himself as the head . . . he wanted to be the high priest and the god being worshiped." Ms. Atkins also testified that as high priest, the Defendant believed that he needed three wives with each wearing a specific ring. Ms. Atkins also told the jury that the Defendant had asked the victim's mother for her permission "to court [D.C.]" and that he wanted "to offer [D.C.] a garnet ring as a lead into the ruby" ring his third wife would wear. However, Ms. Atkins testified that at the time, she did not know the Defendant and D.C. were engaging in sexual activity. On cross-examination, Ms. Atkins testified that her future husband, Louis Atkins, lived in the "vacant" house on the Defendant's property from June 2003 to December 2005 and that the house was fully furnished. Ms. Atkins also admitted on cross-examination that the members of the gaming group would talk about "fantasy and fiction" and that it "wasn't abnormal for someone to bring up something that was a little preposterous."

Louis Atkins testified that he was introduced to the Defendant and his gaming group through the victim's mother, who he had met on the internet. Mr. Atkins testified that he moved to Marshall county in 2002 and moved into the "vacant" house on the Defendant's property in the summer of 2003. Mr. Atkins further testified that in 2004, the Defendant "started talking about wanting to court [D.C.]" and that the Defendant claimed "if he did not have three wives by a certain point, that he would lose his soul." Mr. Atkins testified that all the members of the gaming group played a role in taking care of the children. Mr. Atkins also testified that one night, while he was in the kitchen, he heard D.C. call out from her room "that she was ready to have sex." Mr. Atkins testified that he told D.C.'s mother about this and that she told him she would handle it.

On cross-examination, Mr. Atkins testified that while he lived in the "vacant" house, he spent most of his time in the trailer with the other members of the gaming group. Mr. Atkins admitted on cross-examination that the members of the group spent a lot of time

talking about "fanciful" things like role playing games, video games, Star Trek, and other things "not within the realm of reality." Mr. Atkins also admitted that members of the group talked about killing dragons in their role playing game and that they would talk about "imaginary deities" or Greek and Norse gods. On redirect examination, Mr. Atkins testified that the Defendant talked about being possessed by demons that would take over his personality.

Elizabeth Poole testified that she visited the Defendant's home in 2002 around the victim's ninth birthday. Ms. Poole testified that the Defendant took D.C. on a shopping trip to the mall and to see a movie and that they were gone for over six hours. Ms. Poole also testified that while she was visiting the Defendant, he would take D.C. on walks into the wooded area behind the home. Detective Bob Johnson of the Marshall County Sheriff's Department testified that he was the lead investigator in the case and that the case was first reported to him on May 28, 2008.

*III. The Defendant's Evidence*

The Defendant did not testify at trial and presented only one witness in his defense, his wife and the victim's mother, Holly Montgomery. Ms. Montgomery testified that outside D.C.'s bedroom was a very sensitive baby monitor that allowed her to hear D.C. whisper from the bed if her door was open. Ms. Montgomery further testified that she could hear "slightly above a whisper" if the door was closed. Ms. Montgomery also testified that she never turned the monitor off and that if someone did "the receivers would squeal." Ms. Montgomery told the jury that D.C.'s bedroom door would "squeak or make an almost a groaning noise" when it was opened. Ms. Montgomery testified that she taught all of her children that no one was to touch their "privates." According to Ms. Montgomery's testimony, D.C. was "kind of manipulative" and D.C. sent a letter to her younger sister promising to get her back from her mother's custody. Ms. Montgomery also testified that the Defendant never asked her permission to "court" the victim. According to Ms. Montgomery, the Defendant had a very large scar on his hip and a distinctive scar on his penis.

On cross-examination, Ms. Montgomery admitted that she was having a sexual relationship with the Defendant while she was married to the victim's father. Ms. Montgomery denied ever having a sexual relationship with Ms. Atkins. Ms. Montgomery also testified on cross-examination that she was "diagnosed with multiple personality disorder," had over 100 personalities, and that the personality of Andara was testifying in court. Ms. Montgomery continued that Andara was "the name [she] chose for a designation for [herself]" because she "liked the way it sounded." The State then asked if Ms. Montgomery had ever "claimed to be anyone's slave" and defense counsel objected on the

grounds that the question was not relevant and that question's prejudicial effect outweighed its probative value. The trial court overruled the objection reasoning that whether Ms. Montgomery had told someone she was a slave "would go to her bias or motive." Ms. Montgomery responded by asking the prosecutor if he was "asking the body or the personality sitting in front of [him.]" The State then asked if "any of [her] personalities" had claimed to be a slave. Ms. Montgomery testified that she had claimed to be the Defendant's slave.

Ms. Montgomery also admitted that she had told other people that the Defendant was possessed by a demon. Ms. Montgomery testified that she told other people that she and the Defendant killed the demon. Ms. Montgomery admitted that she had told others that the Defendant was possessed by a demon during the time D.C. claimed she and the Defendant engaged in sexual activity. Ms. Montgomery testified that she and the Defendant talked about the demon, whose name was Lolly Pop. Ms. Montgomery explained that Lolly Pop was a term for a little or young dragon. Ms. Montgomery further testified on cross-examination that she and the Defendant killed the demon by running a blade over the Defendant's body. Ms. Montgomery denied that the Defendant talked about starting a church with himself as the high priest and needing three wives. However, Ms. Montgomery admitted that the Defendant had spoken about three wives wearing three different rings "[i]n a game."

Ms. Montgomery also admitted that she had told her friend Nonny that the demon in the Defendant had asked her if it could court D.C. Ms. Montgomery also told Nonny that there was a period of time when the Defendant "had a problem with being taken over by an enemy." Ms. Montgomery told Nonny that, if what D.C. alleged had happened during that time, she did not "think there [was] a problem" but if it was after that she would "have some hard decisions to make." Ms. Montgomery also told Nonny that if "Lolly Pop did use [the Defendant's] body[] that way . . . [the Defendant would] probably kill himself [before trial]." The prosecution asked Ms. Montgomery if that statement meant she thought "there was a possibility that the demon in [the Defendant's] body . . . could have done this." Ms. Montgomery responded that she "acknowledge[d] all possibilities, including the possibility that [the prosecutor] could have done something to my daughter." Ms. Montgomery also testified that D. C. smelled "fey" which she described as "a spiritual scent," like "an angel feels like," smelling "like sunshine."

*IV. Trial Outcome*

Based on this evidence the jury convicted the Defendant of all nine counts of rape of a child. Following a sentencing hearing, the trial court sentenced the Defendant as a Range I standard offender. The trial court sentenced the Defendant to 15 years for each of the first

six counts and to 20 years for counts seven through nine. The trial court ordered counts two and three to be served concurrently with count one; counts five and six to be served concurrently with count four; and counts eight and nine to be served concurrently with count seven. The trial court then ordered counts one, four, and seven to be served consecutively for an effective sentence of 50 years to be served at 100 percent.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions for rape of a child. See Tenn. Code Ann. § 39-13-522. The Defendant argues that there were several "blatant problems" with the State's evidence, namely the victim's testimony was contradicted by the fact that there was a baby monitor outsider her room. The Defendant additionally contends that the testimony reflected that D.C. was manipulative, lied about the vacant house, and failed to testify about the Defendant's scarring on his penis. Based on the inconsistencies in D.C.'s testimony, the Defendant argues the evidence does not support his convictions. The State responds that the jury resolved any inconsistencies in the evidence in favor of the State and that the evidence is sufficient to sustain the Defendant's convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522. The Tennessee Code Annotated defines sexual penetration

as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

At trial, the victim testified in detail about each of the charged offenses and described each of the sexual acts she engaged in with the Defendant. D.C. testified about three incidents where she performed fellatio on the Defendant, three incidents where the Defendant performed cunnilingus on her, two incidents where the Defendant digitally penetrated her vagina, and one incident where the Defendant penetrated her vagina with his penis. The evidence at trial also showed that D.C. was under 13 at the time of all of the charged offenses. The State also presented evidence corroborating D.C.'s testimony. At trial, the Defendant attempted to discredit and show inconsistencies with the State's evidence. However, it is the province of the jury, not this court, to resolve any conflicts in the evidence. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions for nine counts of rape of a child.

## II. Evidentiary Issues

The Defendant contends that the trial court erred by admitting evidence in violation of Tennessee Rules of Evidence 403 and 404(b). Specifically, the Defendant contends that the trial court erred in allowing D.C. to testify about uncharged sexual activity she and the Defendant engaged in. The Defendant also contends that the trial court erred by allowing Ms. Atkins to testify that she had a sexual relationship with the Defendant and that the Defendant wanted to found a church with himself as the "high priest" and "god." The Defendant further contends that the trial court erred in allowing Ms. Montgomery to testify about her alleged multiple personalities and her belief that the Defendant was possessed by a demon. The State responds that the trial court complied with the requirements of Rule 404(b) and properly admitted the evidence of uncharged sexual contact between the Defendant and D.C. The State further responds that even if the trial court erred, the error is harmless "in light of the overwhelming evidence of the [D]efendant's repeated rapes of the victim." The State also responds that the Defendant failed to contemporaneously object to Ms. Atkins and Ms. Montgomery's testimony and, therefore, has waived the issue on appeal.

### A. Evidence of uncharged sexual contact between the Defendant and D.C.

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). This rule "is based on the recognition that such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent

propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." Rickman, 876 S.W.2d at 828 (citing Anderson v. State, 56 S.W.2d 731 (Tenn. 1933)). The danger of a jury improperly convicting a defendant based on their character rather than the evidence presented at trial "particularly exists when the conduct or acts are similar to the crimes on trial." Id. (citing State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985)).

Accordingly, Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Tolliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[13] (5th ed. 2005) (evidence admissible to tell the "complete story").

Rule 404(b) requires the court to hold a jury-out hearing regarding the admissibility of specific instances of conduct "upon request." Tenn. R. Evid. 404(b)(1). In order to determine the admissibility of a prior bad act, the trial court should consider the following three factors: (1) whether a material issue other than conduct conforming with a character trait exists supporting admission of the prior act; (2) whether proof of the prior act is clear and convincing; and (3) whether the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(2)-(4). If these three thresholds are met, the evidence may be admitted. We review a trial court's ruling on evidentiary matters under Rule 404(b) for abuse of discretion, provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The issue of whether to admit evidence of uncharged sexual offenses committed by a defendant presents unique difficulties under the Rule 404(b) analysis. The Tennessee Supreme Court explicitly declined to recognize a general "sex crimes" exception to Rule 404(b) that would have allowed evidence of uncharged sexual offenses to be admitted at trial. Rickman, 876 S.W.2d at 828-29. In declining to adopt this exception, our supreme court noted that "evidence admitted under a general sex crimes exception is said to be for purposes of corroboration, or to show the intimate relations between the parties, or to show that the defendant had a lustful disposition." Id. at 828. The supreme court held that these exceptions were not embodied in Rule 404(b) and rejected them in its Rickman opinion. Id. at 829-30. Instead, "evidence of prior sexual misconduct is governed by the same evidentiary rules as evidence of other non-sexual misconduct." Id. at 829. Accordingly, we conclude

that it was error for the trial court to admit the evidence of the prior sexual activity between the Defendant and the victim in order to show "the relationship between the parties." State v. Dutton, 896 S.W.2d 114 (Tenn. 1995); see also State v. Willie Earl Brown, Jr., M2009-00505-CCA-R3-CD, 2010 WL 4396490, at *14 (Tenn. Crim. App. Nov. 5, 2010) (concluding it was error for the trial court to admit evidence of prior sexual activity between the defendant and the victim to explain the "dynamics of the relationship"); State v. Otis Breeden, 03-C0L-93L0-CR00335, 1995 WL 390952 (Tenn. Crim. App. July 5, 1995) (concluding that evidence of prior sexual acts was inadmissible to show the state of intimacy between the victim and the defendant).

The supreme court created a narrow "special rule admitting evidence of other sexual crimes when an indictment charges a number of sexual offenses, but alleges no specific date upon which they occurred." Rickman, 876 S.W.2d at 828. This narrow exception applies "in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." Id. Therefore, "where the indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible." Id. (emphasis added). Additionally, "the State must elect at the close of its proof-in-chief as to the particular incident for which a conviction is being sought." Id. at 829. However, when the indictment is date specific, "the prejudice resulting from such [evidence] outweighs its probative value." Id. at 830 (citing State v. Burchfield, 664 S.W.2d 284, 287 (Tenn. 1984)).

The trial court misapplied the holding of Rickman to this case. The narrow exception described in Rickman only applies when the indictment alleges that "unlawful sexual contact between the defendant and the victim" occurred over a span of time. 876 S.W.2d at 828. If that is the case, then the State may introduce evidence of any sexual contact between the victim and the defendant within that time period even though it ultimately may not seek a conviction for each particular incident. While the State's theory in this case was that the Defendant repeatedly had sexual contact with the victim from 2002 to 2005, that is not what is alleged in the indictment, which was more time specific. The indictment alleged that the Defendant engaged in specific sexual acts with the victim on three separate occasions occurring on specific dates in September 2003, December 2004, and April or May 2005. Additionally, the trial court allowed the victim to testify about her first sexual encounter with the Defendant which occurred in another county in 2002, before the first indicted offense in September 2003. Therefore, the narrow exception in Rickman would not apply to testimony regarding the 2002 incident. Accordingly, we conclude that the trial court erred to the extent it allowed evidence of prior sexual contact between the Defendant and the victim to be admitted on the basis of the narrow exception enunciated in Rickman.

The trial court also reasoned that evidence of the Defendant's other sexual encounters with the victim was admissible "to tell the complete story." In order for contextual background evidence to be admissible the State must establish, and the trial court must find, that (1) the absence of the evidence would create a conceptual void in the State's case; (2) the void would likely result in significant jury confusion; and (3) the probative value of the evidence outweighs the danger of unfair prejudice. Gilliland, 22 S.W.3d at 272. There is nothing in the present record to suggest that evidence of the victim's first sexual encounter with the Defendant and other sexual encounters were "so inextricably connected in time, place, or manner that the jury would be unable to comprehend the essential nature of the charged crime without hearing evidence of the 'other' crime." COHEN ET AL, TENNESSEE LAW OF EVIDENCE § 4.04[13] (5th ed. 2005). The victim testified in graphic detail about each of the charged offenses, and the State presented testimony from other witnesses which included, among other things, evidence that the Defendant sought some sort of romantic relationship with the victim. There was nothing about the facts of the charged offenses that would confuse the jury without proof of the uncharged conduct. Accordingly, we conclude that evidence of other, non-charged, sexual encounters between the Defendant and D.C. was not needed to provide the jury the "complete story" in this case.

The trial court was also incorrect in its reasoning that the probative value of this evidence outweighed its possible prejudicial effect because the jury would either believe the victim or not. Our supreme court has long recognized "the inherently inflammatory nature" of evidence of other sexual offenses and recognized that "the danger of prejudice may require the sacrifice of relevant evidence in order to assure fairness to the criminal defendant." Burchfield, 664 S.W.2d at 287 (quoting Shockley v. State, 585 S.W.2d 645, 653 (Tenn. Crim. App. 1978)). The evidence of the uncharged sexual encounters "did not go to the material issue of whether" the Defendant committed the charged offenses, but was "propensity evidence, precisely what the Rickman court feared when declining to adopt a 'sex crimes' exception to Rule 404." State v. Jeff Carter, No. M2009-02399-CCA-R3-CD, 2010 WL 5343212, at *12 (Tenn. Crim. App. Dec. 16, 2010) (citing Rickman, 876 S.W.2d at 828). Accordingly, we conclude that the trial court erred when it ruled evidence of the Defendant's prior sexual contact with the victim was admissible.[3] However, this does not end our inquiry.

The Tennessee Rules of Appellate Procedure provide for harmless error review in such cases. See Tenn. R. App. P. 36(b). The United States Supreme Court has also "repeatedly recognized" that "most constitutional errors can be harmless." Washington v.

---

[3] At the pretrial hearing D.C. testified that the Defendant also showed her pornography on several occasions. This evidence was not presented at trial, but we note that it would have been inadmissible for the same reasons as the evidence of the uncharged sexual acts.

Recuenco, 548 U.S. 212 (2006) (citing Neder v. United States, 527 U.S. 1, 8 (1999) (quoting Arizona v. Fulminante, 499 U.S. 279, 306 (1991))). However, "[a]ll errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Accordingly, our supreme court "has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." Id. As relevant to this issue, our supreme court has noted that "errors in the admission of evidence do not normally take on constitutional dimensions." Id. at 375 (citing State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003)).

In determining whether non-constitutional errors are harmless, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" Rodrigez, 254 S.W.3d at 372 (quoting Tenn. R. App. P. 36(b)). While substantial evidence of the defendant's guilt makes it difficult for "the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial," harmless error inquiry "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict [wa]s correct." Id. at 372. Rather, "the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision making." Id. Furthermore, "[t]he harmful effects of propensity evidence that undermines a defendant's credibility increase in close cases when the outcome depends on the jury's assessment of the witnesses' credibility" making errors in admitting evidence "less likely to be harmless in close cases." Id. at 377.

In Rickman, the supreme court held that testimony relating to the defendant's prior sexual activity with his stepdaughter when she was seven or eight years old was inadmissible and that the prejudice of the testimony outweighed the probative value of the evidence when the defendant was on trial for acts committed with his stepdaughter that occurred years later. Rickman, 876 S.W.2d at 826-30. In two similar cases, this court held that testimony from the victim regarding uncharged sexual acts was highly prejudicial and not harmless error. State v. Woodcock, 922 S.W.2d 904, 912 (Tenn. Crim. App. 1995); State v. Frank Daniel Peters, No. 03C01-9312-CR-00405, 1994 WL 678541, at *3 (Tenn. Crim. App. Dec. 6, 1994). In Woodcock, the victim testified in graphic detail about several incidents of uncharged sexual conduct and the State made "innumerable references to the incidents." 922 S.W.2d at 909-11. A panel of this court concluded that given the "shocking" nature of the testimony and its sheer volume in comparison to the five indicted offenses the evidence "more probably than not did affect the judgment" in the case. Id. at 912. Similarly, in Peters the victim testified about the indicted offense but also testified "that during the year preceding" the incident the defendant touched her breasts and vagina on several occasions. 1994 WL 678541 at *1. This court concluded that the evidence of uncharged sexual acts was

"a significant part of the victim's testimony" and created an "overwhelming prejudice." Id. at *3.

In a more recent decision applying the analysis from the supreme court's decision in Rodriguez, this court concluded that admitting evidence of uncharged sexual offenses was not harmless error. Carter, 2010 WL 5343212 at *15. In Carter, the defendant was charged with one count of rape of a child, but "the jury heard several mentions that the [d]efendant had sexually abused [the victim], beyond that of the indicted offense." Id. The victim testified that the defendant molested her "[e]very other day" and that on other occasions the defendant had digitally penetrated her and had oral sex with her. Id. Additionally, the State produced three witnesses who testified that the Defendant had confessed to them that he had sexually abused the victim. Id. at *5-6. This court noted that "the only [direct] evidence that the [d]efendant sexually abused [the victim] was [the victim's] testimony." Id. at *15. The evidence of uncharged sexual acts bolstered the victim's testimony while undermining the defendant's credibility. Furthermore, the risk that a jury would convict a defendant based upon propensity evidence "is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial." Id. (quoting State v. Thacker, 164 S.W.3d 208, 239 (Tenn. 2005)). Because the case hinged upon the victim's credibility, this court concluded that "more probably than not, hearing [the] propensity evidence affected the jury's assessment of the credibility of the witnesses and allowed the jury 'to conclude more comfortably' that the [d]efendant sexually abused [the victim]." Id.

In determining whether the admission of the evidence was harmless in this case, we first note that, similar to the testimony presented in Rickman, Woodcock, Peters, and Carter, D.C.'s testimony was the primary evidence that the Defendant raped her. Much like Peters and Carter the evidence of the uncharged sexual acts was a significant part of D.C.'s testimony. The erroneously admitted testimony from D.C. allowed the jury to infer that the Defendant had been abusing her for almost a year prior to the indicted offenses and that from 2002 to 2005 the Defendant engaged in sexual activity with the victim between 7 and 22 other times than those contained in the indictment. Additionally, D.C. testified in graphic detail about the incident that occurred on her ninth birthday, a full year before the first indicted offense, and the State also provided the testimony of Elizabeth Poole to corroborate D.C.'s description of her trip with the Defendant. As previously noted by our supreme court, evidence of this type has a severe prejudicial effect at trial. See Rickman, 876 S.W.2d at 830; Burchfield, 664 S.W.2d at 287. Indeed, "[t]here is no subject which elicits a more passionate response than the sexual exploitation of children. Society abhors, and rightfully so, the victimization of the defenseless child.'" Rodriguez, 254 S.W.3d at 376 (quoting United States v. Villard, 700 F. Supp. 803, 809 (D.N.J. 1988)). Accordingly, we believe that the erroneously-admitted evidence prejudiced the Defendant and affirmatively affected the

result of the trial on the merits. We reverse the judgments of the trial court and remand the Defendant's case for a new trial.

### B. Ms. Atkins and Ms. Montgomery's testimony

The Defendant contends that Ms. Atkins' testimony that she had a sexual relationship with the Defendant and that the Defendant wanted to found a church with himself as the "high priest" and "god" violated Tennessee Rule of Evidence 403. The Defendant also contends that Ms. Montgomery's testimony about her alleged multiple personalities and her belief that the Defendant was possessed by a demon violated Rule 403. Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." However, a party's failure to raise a contemporaneous objection generally waives the issue on appeal. Tenn. R. App. P. 36.

Regarding Ms. Atkins' testimony, the Defendant only objected to the relevancy of the testimony regarding her sexual relationship with the Defendant and did not raise a Rule 403 objection. The Defendant also only objected to the use of the word "pagan" in describing the Defendant's alleged desire to start a new religion with himself as the god and failed to object to the actual testimony regarding this desire. With respect to Ms. Montgomery's testimony, the Defendant only objected to the prosecution's questioning of whether she had ever claimed to be a slave because "[i]t [got] into bondage and sado-masochism." The Defendant never objected to Ms. Montgomery's testimony regarding her alleged multiple personalities or her belief that the Defendant was possessed by a demon. While there may have been Rule 403 issues with the testimony, especially Ms. Montgomery's, the Defendant failed to raise a contemporaneous objection at trial. Accordingly, we concluded that the Defendant has waived these issues on appeal.

### CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed. The Defendant's case is remanded for a new trial.

_____
D. KELLY THOMAS, JR., JUDGE

-16-