# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 1, 2011 Session

## STATE OF TENNESSEE v. BRUCE TURNER

**Appeal from the Criminal Court for Shelby County**
**No. 09-03560    Carolyn Wade Blackett, Judge**

---

**No. W2010-02513-CCA-R3-CD  - Filed May 25, 2012**

---

The Defendant, Bruce Turner, was convicted by a Shelby County Criminal Court jury of rape of a child, a Class A felony. See T.C.A. § 39-13-522 (2010). He was sentenced to twenty-five years' confinement and community supervision for life. On appeal, he contends (1) that he did not receive a unanimous jury verdict and that the evidence is insufficient to support his conviction; (2) that the trial court erred by allowing the victim to testify about a sexual assault that occurred in Louisiana; (3) that the trial court erred by allowing the victim's mother to testify that she saw a handgun in the Defendant's bedroom; and (4) that the trial court erred by allowing the victim's mother to refer to herself as a hostage. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. JERRY L. SMITH, J., not participating.

Stephen C. Bush, District Public Defender; and Barry W. Kuhn (on appeal), Sanjeev Memula (at trial), and James Green (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Bruce Turner.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton and Brooks Yelverton, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant was convicted of the rape of his former stepdaughter, who was eleven years old at the time of the incidents. At the trial, the victim testified that she lived in Memphis from November 1, 2008, to January 24, 2009, with her mother, her younger brother, and the Defendant. She said that around Thanksgiving 2008, her relationship with the Defendant was "okay" and that the Defendant took care of her when her mother worked the night shift. She said that in November 2008, she left for school around 7:00 a.m. and returned home around 3:30 p.m. daily. She said that he Defendant normally got home around 5:30 p.m. and that he was responsible for putting her to bed at night if her mother was at work.

The victim testified that the Defendant "touched" her on her buttocks, which made her uncomfortable. She said that the Defendant told her that he liked her and that she told the Defendant he was supposed to like her mother. She said that not long after, the Defendant began touching her buttocks and "stuff." The Defendant told the victim she was beautiful. She said the Defendant came into her bedroom one night, sat on the bed beside her, and told her that he would give her anything she wanted if she would "do stuff." She said she did not ask the Defendant what he meant because she understood.

The victim testified that on one occasion, she awoke during the night, went downstairs to get a glass of water, and met the Defendant on the stairs. She said the Defendant picked her up and carried her to the downstairs bathroom. She said the Defendant put her on the bathroom counter, locked the door, turned off the lights, and took off her panties. She said she tried to move the Defendant's hands, but he "had [her] hands down." She said the Defendant "put his mouth . . . on my private area." She freed herself, unlocked the bathroom door, and ran. She said her mother was at work and her brother was asleep in his bedroom at the time. The Defendant told the victim that "there would be hell in the house" if she told anyone about the incident. She did not tell anyone what happened because she was embarrassed.

The victim testified that one night while her mother was at work, she went to the bathroom and found the Defendant naked. She was startled, but the Defendant told her that "it was okay." She said the Defendant pulled down her pants. She said she remembered being on the floor while the Defendant put petroleum jelly on his penis and on her. She said, "I was sliding up, like scooting up and he had put his whole body on me and tried to force it in there and it hurt." She said she pushed the Defendant away with her knees when the Defendant laid on top of her. Neither of them spoke during the incident. She said this incident occurred just before she told her friend at school about the Defendant's actions. She also said, however, this incident was the first incident. She said the Defendant did something

-2-

similar on three or four other occasions and used petroleum jelly each time. She said that after each incident, she was sore between her legs but that she did not tell the Defendant about her soreness.

The victim testified that she did not recall much about the second time the Defendant laid on top of her but that she recalled the Defendant told her that if she "[did] it for two weeks[, her] hole would open up and it wouldn't hurt anymore." She told the Defendant to get off her, but the Defendant continued to say that if the victim continued to let him do it, the "hole" would open.

The victim testified that on the next occasion, she was alone with the Defendant because her mother was at work and her brother was not around. She said the Defendant occasionally came into her bedroom while her mother was in the shower. She said all of the incidents occurred in the downstairs bathroom. She said that the lights were always off in the bathroom, except the incident when she went into the bathroom and found the Defendant naked.

The victim testified that she tried to hide from the Defendant the last time he touched her. In describing the incident, the victim said,

> I . . . came in there and all of the lights were off and I didn't see him and he . . . pulled me in there, in the rest-room, and I . . . ran and hid in the shower and he was . . . feeling for me, trying to find me in the shower and he . . . grabbed me and laid me down and took off my panties and stuff.

She tried to get away from the Defendant by sliding up. She said she did not know the Defendant was in the bathroom because the lights were off. She said she was scared. She said the Defendant did not say anything. She said that a towel was underneath her but that she did not know how it got there. She said the Defendant had one hand on her shoulders and used the other to put petroleum jelly on his penis. She said that although the lights were off, she knew the Defendant put petroleum jelly on himself because he always did and she felt the "slippery" petroleum jelly on him. She knew the Defendant put the petroleum jelly on his penis and not his finger "because it hurt." She said the Defendant repeated that if she continued to let the Defendant do it for two weeks, her "hole would . . . open." The Defendant told her that if she got married, her husband would not want to be intimate with her because she would "be too big."

The victim testified that she never had a boyfriend and never had sex before the Defendant. She knew the Defendant's actions were wrong because he was a man and she was a child. She said that a friend at school asked what was wrong after noticing that the victim was acting differently. She told the friend that the Defendant touched her and tried to rape her and that the Defendant put his mouth between her legs and tried to have sex with her. Her friend told her to talk to a counselor. She told her teacher, who called the police. She said that after school that day, the Defendant arrived home around 5:30 p.m. and that a woman from children's services and the police arrived later that evening. On January 23, 2009, she and her brother were removed from their home and placed into foster care for two months. She also lived with her grandparents in Louisiana before returning to her mother's care. Her mother continued to live with the Defendant.

The victim testified that after the Defendant finished each time, she cleaned herself with a towel and that she did not like the feeling of the petroleum jelly between her legs. She said she saw the Defendant ejaculate. She said that although it was dark in the bathroom, she saw "white stuff" when the Defendant "did things" to her. She said it happened quickly and could not recall if the Defendant turned on the light. She said that the night before she told her friend about what happened, she did not see any "white stuff." She said the Defendant used the toilet after he finished.

On cross-examination, the victim testified that the Defendant first touched her buttocks around Thanksgiving 2008 but that she did not tell her mother. She said the Defendant touched her buttocks on two additional occasions. She could not recall the time between the first incident and the additional times he touched her buttocks. She could not recall how much time passed between the incidents where the Defendant laid on top of her, but she recalled the first time occurred in the bathroom.

The victim testified that the Defendant weighed more than she did and that the Defendant inserted his penis into her vagina and pushed "really hard." She said she felt something going inside of her and she pushed out. She said she did not feel any substance in her vagina while the Defendant's penis was in her vagina. She said that while the Defendant's penis was inside her vagina, he pushed for about three or four minutes and caused pain. She moved after the Defendant stopped pushing. She said that she did not see anything come out of his penis at first but that she saw something come out when the Defendant used the toilet.

The victim testified that she could not recall the date of the second incident but that she recalled the police taking her to see nurses. She agreed that the last incident occurred the day before she saw the nurses and that she saw the white substance. She said that the nurses told her that her vaginal opening should not have been as open as it was and that they found something that "shouldn't have been there." She could not recall what the nurses found. She

did not notice any injuries other than the soreness between her legs.

The victim testified that she wrote in her diary that the Defendant did not "do anything" because the Defendant told her that she needed to tell people that "none of this happened." She said the Defendant threatened her and said to "make it happen." She agreed that she kept quiet about the incident but said that her mother was present when the Defendant told her to convince people that she lied. She said the Defendant did not force her to write her recantation. She no longer had the diary, but she wrote in the diary daily when she had it. She agreed the Defendant did not find the diary. She agreed she wrote that she wanted to live in Louisiana because she did not want to live at the shelter.

The victim testified that she disliked her mother being pregnant with the Defendant's child. She agreed that she disliked the Defendant and living in Memphis. She denied that she lied because she was unhappy with the Defendant. She said she wrote in the diary that she lied because the Defendant told her to convince everyone that she had lied. She denied that the day before her testimony was the first day she told anyone about the Defendant's forcing her to write in the diary. She wrote in the diary while at school and said her mother found it in her backpack. She did not recall telling anyone that the Defendant forced her to write in her diary.

On redirect examination, the victim testified that the Defendant "tried" to put his penis in her vagina and that it hurt. She said the Defendant "tried" to rape her because his penis was not fully inserted in her vagina. She said that when she spoke with the woman from the Child Advocacy Center, she had not written in her diary that the Defendant did not do anything wrong. She said the Defendant was not allowed near her after she was returned to her mother.

The victim testified that she and her mother went to Louisiana on Easter weekend and that the Defendant was at their home when they returned. She said that at that time, the Defendant was not allowed around her or her home. She said she stayed in her bedroom and did not see the Defendant while he was there. She could not recall when the Defendant took her to the attic.

The victim testified that on one occasion when she and her mother returned home from an outing, they found the Defendant waiting in the attic. The Defendant told the victim "that [she] better tell them . . . people that [she] made it all up and he didn't care how [she] got it out, just make sure that it was done." She wrote in her diary that she lied because she was afraid of the Defendant, who was mean. She said that after the Defendant told her to lie about what he had done, her mother told her to go to her bedroom. She did not recall if she spoke to Department of Children's Services (DCS) case worker Dakshanique Gary the following day about the diary. She only recalled speaking with Ms. Gary while in foster care.

The victim testified that she was not lying in order to return to Louisiana. She said that although she was not wearing a watch while the Defendant had her on the bathroom floor, it felt as though it lasted forever. She did not call for help while the Defendant had her on the floor because she thought she could get the Defendant off her. She agreed that the last incident took place on January 23 and that no "white stuff" got on her because she could only see petroleum jelly. She said that the Defendant went to the toilet, that "white stuff" came out of his penis, and that she ran out of the bathroom. She said the light in the bathroom was on when the "white stuff" came out.

The victim testified that she was interviewed by the Child Advocacy Center about the various incidents with the Defendant. The victim identified a video recording of the interview she gave on January 26, 2009, to Ms. Claire with the Child Advocacy Center.

The victim's mother testified that she had three children, that the Defendant was her former husband, and that the Defendant was the father of her youngest child. She said that their marriage was happy, loving, and caring in the beginning but that their marriage changed when she became pregnant with their child. She said that the Defendant was manipulative at times and controlling and that there was "turmoil" if something was not done to the Defendant's liking.

The victim's mother testified that on January 23, 2009, she was told by the police and DCS that the Defendant had been raping the victim. She said that she was shocked and in disbelief when she heard the allegations but that she believed the victim was telling the truth. She stated that she had a fluctuating work schedule and that the Defendant cared for her children when she worked at night. She worked the day shift on January 23. She said that she called home that afternoon to check on her children. She spoke to the victim, who told her that two women and two or three police officers were at the front door. She said the victim handed the telephone to DCS investigator Latrice Wright, who asked her to come home.

The victim's mother testified that when she arrived home, Ms. Wright and her children were gone but that the Defendant was there. She called Ms. Wright, who told her that she could meet her at a nearby parking lot to see her children, but Ms. Wright refused to meet the victim's mother when she learned the Defendant was coming to see the children, too. Ms. Wright told the victim's mother that she could see the children at her office. She said that Ms. Wright asked to speak with her privately but that the Defendant did not allow it. She did not know the substance of the allegations when Ms. Wright asked to speak to her privately. She said the victim and the victim's brother were placed in DCS custody.

The victim's mother testified that DCS told her that the victim accused the Defendant of rape. She said that after her children were placed in DCS custody, she returned home to the Defendant. She asked the Defendant what happened, and the Defendant denied knowing why the victim made the allegations. She said she stayed with the Defendant because she was pregnant and had nowhere to go. She recalled speaking to Ms. Wright on January 25, 2009, about the victim's allegations and the findings from the Memphis Sexual Assault Resource Center (Center).

The victim's mother testified that she attended a juvenile court hearing on January 30, 2009, that she testified at the hearing, and that the victim's brother was returned to her custody. She recalled speaking to Ms. Gary from DCS the same week about the victim's allegations, but she could not recall if she told her if she believed the victim. She said she spoke to the victim on the telephone and visited the victim while in DCS custody, but she did not discuss the allegations with the victim.

The victim's mother testified that after her youngest child was born on February 14, 2009, she testified at another juvenile court hearing. She said the judge returned the victim to her custody on the condition that the Defendant not be around the victim. She said, though, that the Defendant violated the condition the same day. She said that when she and the victim got home from court, the Defendant was there.

The victim's mother testified that she and her three children traveled to Louisiana on Easter weekend to visit her family after the victim was returned to her care. She agreed that the Defendant did not want her to go to Louisiana and repeatedly called her cell phone while she was in Louisiana. She said that in the beginning, she did not answer the Defendant's calls but that she eventually spoke to him. She said that she planned to stay in Louisiana but that the Defendant told her to "bring his child back to Memphis or he was coming down to get her." She said she took the Defendant's statement as a threat and returned home with the children. She said the Defendant was home when she and the children arrived.

The victim's mother testified that the Defendant took her cell phone when she walked into the house on Saturday night around 9:00 and smashed it with a hammer. The Defendant told her that he smashed the phone because she did not answer it when he called and that "it better not happen again." She said she felt threatened. She saw the Defendant tell the victim "that she better tell those . . . people that she was lying and he didn't care how she told them." She said the Defendant did not allow her or the children to leave the house. She said she told her children that they needed to leave the house and find help if the Defendant separated her from them. She said she became convinced that the victim was telling the truth. She said the Defendant allowed her to leave the home Monday morning to take the children to school.

The victim's mother testified that after she took the children to school, she went to the library and used a security guard's telephone to contact Youth Villages, whose staff provided her and the victim with counseling. She told a woman at Youth Villages about the weekend's events. She said that the Defendant's presence kept her from leaving home and that she and the woman at Youth Villages both used the term "hostage." She said she feared what the Defendant would have done had she and the children tried to leave the home. She said her cell phone was the only phone in the home. She and her children moved into a shelter at Youth Villages. She said Ms. Gary and police officers escorted her home to pack belongings for herself and her children. She saw a gun on the night stand when she went into the bedroom that she shared with the Defendant to pack a bag. She said the gun was usually on the night stand.

The victim's mother testified that she found the victim's diary one month after moving into the shelter. She read the entry where the victim wrote that she lied about the Defendant's actions. She said she asked the victim why she wrote that she had lied. She said that the victim asked her if she remembered that the Defendant told the victim to say that she lied. She said that she told DCS about the diary but that the dairy was lost during their move from the shelter to Raleigh or from Raleigh to Louisiana.

The victim's mother recalled that she testified at a juvenile court hearing in June 2009, which determined where her children would live because the Defendant was living in the home. She said that she testified at the hearing that she was not held hostage by the Defendant on Easter weekend. She said she lied at the hearing because she was afraid of the Defendant. She said that at the time of the June hearing, the Defendant was not in custody and she was afraid of what the Defendant might do to her. She agreed the victim and the victim's brother were removed from her custody and placed in her parents' custody in Louisiana. She said she stayed in Memphis for the remainder of 2009 while her children lived with her parents in Louisiana. She said that her youngest child was not the subject of the juvenile hearing and that she felt she had to stay with the Defendant. She said that after the Defendant was taken into custody, she moved to Louisiana with all three of her children.

On cross-examination, the victim's mother testified that she and the Defendant were married eight years before the Defendant was accused of rape and that to her knowledge, the Defendant had done nothing to the victim during those eight years. She said the Defendant acted as the victim's father and treated the victim as his own child. She said the victim liked the Defendant. She said the victim may have said that the victim did not like the Defendant's being the father of her youngest child.

The victim's mother testified that she and the victim had a close relationship and that the victim told her almost everything. She denied calling the victim a liar at DCS and telling

DCS personnel the victim was lying. She said she was in shock when she was told about the allegations. She said she stayed with the Defendant after the victim was placed into foster because she was pregnant with the Defendant's child. She said DCS removed the victim from her custody because the Defendant was "still around," not because she did not believe the victim. She agreed that she could have left the Defendant and that she failed to follow DCS recommendations for months.

The victim's mother testified that her Easter weekend trip was cut short and that the Defendant knew she was coming home early. She said that after the Defendant called her, she called the Defendant to tell him that she was coming home. She agreed she testified at the June 2009 hearing that she was not held hostage or against her will, but she said she lied because the Defendant was present.

The victim's mother testified that she found the victim's diary in early May and that the Defendant did not know she had found it. She agreed the Defendant learned of the diary at the June hearing. She said that to her knowledge, the Defendant did not try to take the diary or show it to the police.

On redirect examination, the victim's mother testified that the victim wrote in her diary that she hated the Defendant and that the Defendant was the reason they had to live at a shelter. She believed the victim wrote the recantation at the Defendant's request. On recross-examination, the victim's mother testified that she contacted the Defendant while she stayed at a shelter but that the Defendant did not have contact with her children.

Latrice Wright, a DCS child abuse and neglect investigator, testified that she investigated the victim's case and went to the victim's home around 5:00 p.m. on the day she received information from her supervisor. She said that when her investigation took her to a child's home, she contacted the police for assistance as a precautionary measure to aid in the removal of a child if it was necessary. She said the Defendant answered the door and told her the victim's mother was not home. She told the Defendant that there was concern for the victim and that she wanted to speak with the victim's mother before the victim. She spoke to the victim's mother on the telephone, told her that an allegation was made, and asked if she could come home. The victim's mother told her that she could be home in twenty to thirty minutes and Ms. Wright agreed to wait.

Ms. Wright testified that she observed the victim using the computer while she waited for the victim's mother to arrive. She said the Defendant was on the stairs and stated that the victim's mother would not be able to get home within twenty to thirty minutes. She said that as she approached the victim, the Defendant made "condescending remarks." She said she told the Defendant that she was not leaving the children alone with him because of the nature

of the allegations. The Defendant told her that she should take the children, and she asked the Defendant to get the children's coats.

Ms. Wright testified that after the children were in her car, she telephoned the victim's mother and agreed to meet the victim's mother at a K-Mart parking lot, if she came without the Defendant. She said that she heard the Defendant in the background and that she told the victim's mother to come to her office.

Ms. Wright testified that she spoke to the victim about "good touches and bad touches." She said the victim made "a brief disclosure" of the Defendant's touching her. She said that she and the victim were together from 6:00 p.m. to 4:00 a.m. the following morning and that the victim revealed more information about the Defendant's touching her over time. She said the victim disclosed penetration within the previous forty-eight hours, and she took the victim to the Center for an examination.

Ms. Wright testified that she never told the victim that the victim could move to Louisiana if she made an allegation against the Defendant. She said the only information the victim gave about Louisiana was that the Defendant touched the victim for the first time around Thanksgiving while the victim's family was there. She said that the victim never stated that she wanted to return to Louisiana but that the victim expressed concern about her mother's pregnancy and the impact of stress on the unborn child.

On cross-examination, Ms. Wright testified that she went to the victim's home on January 23, 2009, and that the Defendant complied with her taking the children from the home. She disagreed, however, that the Defendant volunteered to help get the children out of the home to resolve the problem. She said the Defendant suggested she take the children, but disagreed he was cooperative.

On redirect examination, Ms. Wright testified that she believed the Defendant was being manipulative when he said the victim's mother would not arrive home in time to speak with her. She said she overheard the Defendant's telling the victim's mother that Ms. Wright wanted to take the children. Although she told the victim's mother that she would wait until she arrived home, she decided to take the children before the victim's mother arrived because she felt the Defendant was being manipulative.

DCS case worker Dakshanique Gary testified that she was assigned to the victim's case after the victim was removed from her mother's home. She said the victim told her that she was molested by the Defendant. She received a telephone call on April 14, 2009, from the Youth Villages counselor assigned to the victim's case about the Easter weekend events. She spoke with the victim's mother, who felt threatened and believed her children were in danger.

Based on her conversation with the victim's mother, she secured a room for the victim's mother and her children at Youth Villages. She said she spoke to the victim and her brother at their school. They first denied seeing the Defendant Easter weekend, but later said they were dishonest because they feared being taken away from their mother again.

Ms. Gary testified that she believed the victim's story because of the way the victim spoke and presented herself and the results of the physical examination. She said that she visited the victim on June 2, 2009, and that her mother mentioned the victim's diary. Although she did not see the diary, the victim's mother told her that the victim wrote that the Defendant did not do anything wrong. She asked the victim about the diary entry, but the victim did not want to talk about it. She said the victim neither admitted nor denied writing the entry. She said that she continued to believe the victim's allegations after learning of the diary entry.

Ms. Gary testified that the victim's primary concern during the investigation was her mother. She said the victim was concerned for her mother's pregnancy and at times wanted the "whole big mess to just go away." The victim said she believed that if she recanted her story, she could go home to her mother. She said, however, the victim's story never changed.

On cross-examination, Ms. Gary testified that she was present at the April 2009 hearing at which the victim's mother testified that the Defendant did not hold her hostage Easter weekend. On redirect examination, Ms. Gary testified that the victim was not allowed to return home with her mother because the victim's mother continued to live with the Defendant. She denied that the victim was placed in foster care because the victim's mother did not initially believe the allegations.

Judy Pinson, an expert in sexual assault nurse examinations, testified that she was a nurse examiner and the nurse services coordinator at the Center. She did not examine the victim, but she brought the victim's records to court. The records showed that Beth Humphreys examined the victim on January 23, 2009, at 11:20 p.m. The victim was referred to the Center for an examination by the Memphis Police Department. The examination performed on the victim was primarily a "genital exam" with an assessment to the remainder of her body to ensure there were no other injuries. The records showed that the examining nurse noted the victim's following statement:

> [The victim] [r]eports that when her brother got into the tub she
> went into [the Defendant's] bedroom to get the phone. While
> there [the Defendant], approximately age 47 to 49, told her to
> take off her pants and panties and lay on the floor. She then
> states that [the Defendant] took off his pants and put Vaseline

-11-

on his penis and on her vagina. She reports that he laid on top of her and put the head of his penis in [her] vagina. She reports that she tried to get up and told him to stop, but he kept pulling her legs down. She noticed [on that occasion] and the last time, white stuff came out of his penis and some got on her leg and the top of her vagina. She reports that this incident not only happened on 1/22/09, but on Monday 1/19/09. She told her friends at school and told the Principal. The Principal called the Department of Children's Services and the police were called.

Ms. Pinson testified that nurses examined the hymen because "if there may be injury[,] it may be to the hymen." She said relative to children, even when there is full penetration, it was possible to see no injury. She said the hymenal membrane was thin tissue that surrounded the vaginal opening. She said the presence of estrogen caused the hymen to be fuller, and the hymen would show less injury when estrogen was present.

Ms. Pinson testified that the victim had no established estrogen based on the thickness and color of the hymenal membrane. She said no recent trauma was found but "chronic genital injury of the hymen" was found. She said a recent genital injury presented possible redness, swelling, and bleeding. She said a chronic injury would not show redness or swelling. She said the victim had a "notch," or indentation, on her hymen. She said that the notch meant that there could have been an injury at one time which healed and that "the injury would have been some kind of penetration." She said the victim's allegations that the Defendant inserted his penis in her vagina were consistent with the nurse's findings. She was not surprised that the examination did not show recent injury when the victim reported sexual contact the night before. She was uncertain if children understood the meaning of penetration. She said children described contact to the genital area in the same way because children lacked adult experiences and used different language than adults.

Ms. Pinson testified that examining nurses asked a child if he or she bathed, showered, wiped off, urinated, drank, or ate since the sexual contact. She said these questions were important for evidentiary purposes because water and urine could have washed away any seminal fluid or Vaseline. She said the nurse would have documented the presence of Vaseline if observed. She said the victim told the nurse that she urinated and had a sponge bath, bath, or a shower.

On cross-examination, Ms. Pinson testified that her testimony was based on the report completed by the examining nurse. She agreed a portion of her job was related to testifying at court proceedings involving sexual abuse but disagreed that one of her goals was to find people who commit sexual offenses. She agreed the victim's statement that "white stuff"

came from the Defendant's penis indicated semen. She did not send collected evidence to the Tennessee Bureau of Investigation (TBI) for DNA analysis. She said a rape kit was taken, but she did not know how much DNA, if any, remained on the victim's skin after bathing and wiping off. She said that to conclude there was evidence of sexual abuse, the examining nurse had to document his or her observations. She agreed the victim's general examination showed no injuries. The report showed the nurse found no chronic anal injury.

Ms. Pinson testified that nurses looked for cuts, tears, and bruising of the hymen because they can be evidence of sexual contact. She said the nurse found no cuts, tears, redness, or bruising to the victim's hymen. She said it depended on the location of the hymen "notch" as to whether it was important to determine the type of hymen. The nurse was unable to determine the victim's type of hymen. She said that the notch was located on the inferior hymen and that the depth of the notch was not documented. She said that if the nurse had documented that the "cleft" was complete, then there would not have been a notch. She agreed the nurse documented the location of the notch only.

Ms. Pinson testified that the cause of the injury was indeterminable and that the injury could have been caused by other means. She agreed the notch could have been harmless and normal, but she said the notch could have also been caused by injury. She disagreed that the injury to the hymen was "normal" and caused by everyday activities such as bike riding. She said something had to enter the hymen to cause the notch on the victim's hymen. She said it was unlikely that scratching caused the injury to the hymen. She agreed, however, that she could not determine if the victim was sexually abused and that the examining nurse would have documented "clear evidence" of blunt force or penetration to the hymen if it was observed. She agreed the nurse made no such observations. She agreed it was possible that the notch was normal.

On redirect examination, Ms. Pinson testified that the victim lay on her back during the examination and that the location of the notch was closer to her anus. She said something had to be inserted to cause the notch. She said the location of the notch was consistent with the victim lying on her back while a penis was inserted in her vagina. She said the first place a penis would go was the "bottom of the hymen." She said the victim's story that the Defendant attempted to put the head of his penis into her vagina was consistent with the injury found. She said nothing found during the examination caused her to doubt the victim's credibility or allegations.

Donna Nelson, an expert in DNA testing, testified that she analyzed evidence for the presence of body fluid for the TBI. She said she examined the vulvar swabs submitted from the victim for the presence of semen but found none. Because no semen or sperm were present, she could not perform a DNA test. She said that semen was not always present in

rape cases, depending on the length of time after an assault the evidence was collected and whether the victim had bathed. The victim's examination and rape kit were performed twenty-seven hours and twenty minutes after the time the victim said a sexual assault occurred. She said she would not have expected to find the presence of semen in this case because the victim reported that she urinated and bathed before the examination. She said bathing would have washed away evidence. On cross-examination, Ms. Nelson testified that the victim reported that the sexual assault occurred the night before the examination.

Upon this evidence, the Defendant was convicted of one count of rape of a child. He was sentenced to twenty-five years' confinement and community supervision for life. This appeal followed.

**I**

The Defendant contends that he did not receive a unanimous jury verdict because the jury could not determine for which event the State sought a conviction. The Defendant also contends that the evidence is insufficient to support his conviction because there was no evidence that he penetrated the victim with his penis during the sexual assault elected by the State. The State contends that the election sufficiently identified and distinguished the charged offense to allow the jury to render a unanimous verdict and that the evidence was sufficient to support the Defendant's conviction. We agree with the State.

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. See, e.g., State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1998); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134, 136 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision." Shelton, 851 S.W.2d at 138.

> This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the

-14-

same offense.

State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000). The most important reason for requiring the election is to protect a defendant against "patchwork verdicts." Shelton, 851 S.W.2d at 137.

"The election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated." State v. Johnson, 53 S.W.3d 628, 631 (Tenn. 2001) (citing Brown, 992 S.W.2d at 389). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." Id. (citation omitted). "[T]he offense must be proven in accordance with the election. . . . If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." State v. Johnny Lee Hines, No. 01C01-9709-CC-00405, Bedford County, slip op. at 6 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." State v. Marvin D. Nance, No. E2005-01623-CCA-R3-CD, Greene County, slip op. at 7 (Tenn. Crim. App. Feb. 23, 2007) (citing Johnny Lee Hines, slip op. at 6).

At the trial, the trial court instructed the jury as follows:

> The State has offered proof in its Case in Chief of more than one act allegedly committed by the Defendant which the State alleges constitutes an element of the offense of Rape of a Child. . . . To ensure a unanimous verdict, the law requires the State to elect which alleged act testified to the State is relying upon for your consideration in deciding whether or not the Defendant is guilty of this offense or any lesser included offense. . . .
>
> [T]he State has elected to submit for your consideration the alleged criminal offense of Rape of a Child which allegedly occurred between the Victim . . . and the Defendant . . . where he pulled her into the upstairs bathroom . . . and pushed her to the floor. He allegedly held her with one hand and put petroleum jelly on his penis and the victim's vagina with his other hand. He then allegedly pushed his penis into the [victim's] vagina . . . and she tried to pull her legs up repeatedly, but the Defendant . . . allegedly pulled them back down each

-15-

time. The Victim . . . didn't cry out because she thought she could stop the assault by pushing her legs up and away from the Defendant. This is the assault that allegedly occurred on the Monday, on or about January 19, 2009, before the last sexual assault that prompted her disclosure to her friend . . . [s]chool. This is the incident where the Defendant told [the victim] that she would have to do this act for two weeks in order that the victim's "hole" would open up and it wold not hurt anymore when the Defendant placed his penis in her vagina.

To the members of the jury you are to consider only this alleged act in deciding whether or not the Defendant has been proven guilty beyond a reasonable doubt of the offenses charged. . . .

We conclude that the State's election was sufficiently detailed to identify and distinguish the incidents to allow the jury to render a discrete and unanimous verdict on the single count of rape of a child. See Marvin D. Nance, slip op. at 7.

The victim recalled one incident in which she left her bedroom in the middle of the night to get a glass of water. As the victim went down the stairs, she saw the Defendant on the staircase, and he carried her into the downstairs bathroom. The lights were off in the bathroom, and the Defendant closed and locked the door. The Defendant took off the victim's underwear, held her hands down, and put his mouth on her vagina. She said nothing to the Defendant during the incident. The record shows no date for the incident and cannot be the State's elected offense as these facts do not appear in the election.

In another incident, the victim went into the downstairs bathroom and found the Defendant naked, who told the victim it was "okay." She remembered the Defendant's grabbing her and being on the bathroom floor while the Defendant put petroleum jelly on his penis and her vagina. She said that she slid and scooted up with her legs in an attempt to free herself from the Defendant but that the Defendant put his entire body on top of her and "tried" to put his penis in her vagina. She said she scooted up while the Defendant took off her pants. Neither the victim nor the Defendant said anything during this incident. She said this was the only incident in which the lights were on in the bathroom. The record shows that the victim thought that the Defendant only attempted to rape her because the Defendant's penis was not fully inserted in her vagina. She said that the Defendant used petroleum jelly each time he "tried" to rape her and that she was sore between her legs after each incident. The victim said that this incident occurred "right before [she] told somebody" about the Defendant's actions. The victim also said, however, that this "was the

-16-

first incident." The record, therefore, is unclear if this was the first incident, the last incident which occurred the night before DCS came to the victim's home, or some other incident. In any event, this cannot be the State's elected offense because there is no evidence that the Defendant made the statement regarding the two-week period.

The victim did not recall much about the "second time" the Defendant touched her, but she recalled that the Defendant told her that if she "[did] it for two weeks[, her] hole would open up and it wouldn't hurt anymore." She told the Defendant to get off her, but the Defendant repeated the statement. Although the two-week statement was made here, the "second time" cannot be the State's elected offense because there is no evidence of the other facts contained in the election.

The victim said that during the incident after the second incident, the Defendant said nothing to the victim. The record shows no other identifiable information addressing this incident labeled the incident after the second. This, too, cannot be the State's elected offense.

The record shows that the victim said that "the last time" occurred when she went to use the bathroom. The victim said that the lights were off, that the Defendant was already in the bathroom, and that the Defendant grabbed her. The victim ran and hid in the shower, but the Defendant felt for her in the shower, found and grabbed her, laid her on the floor, and removed her underwear. The victim attempted to get away from the Defendant by sliding up. The Defendant used one hand to hold the victim down and the other to put petroleum jelly on the Defendant's penis. She said that the Defendant's putting his penis in her vagina hurt and that the Defendant told her that if she continued "doing [it] for two weeks[,] her hole would be open." The Defendant told her that if she married, she would not want to be intimate with her husband "because [she] would be too big and they would be small." She said that she did not call out for help during any of the incidents while the Defendant had her on the bathroom floor because she thought she could get the Defendant off her. Although the victim did not state whether this incident occurred in the upstairs or downstairs bathroom, the victim testified that the upstairs bathroom was the only bathroom with a shower in the home. The victim agreed the last incident occurred on January 23, 2009, and the examining nurse's notes showed that the victim said that the last two incidents occurred on January 19 and January 23. Although the victim called this incident "the last time," all of this incident's facts were contained in the State's election.

Although the election of the offense labeled the elected offense as the second to the last incident, the evidence shows that the all of the facts contained in the State's election occurred only during the last sexual assault. Although the evidence also shows that the Defendant made the statement regarding the two-week period during the second incident,

this incident cannot be the elected offense because none of the other facts contained in the election were established for the second incident. The evidence about the last incident, however, established all of the remaining facts contained in the election, including that the incident occurred in the upstairs bathroom. We note that the evidence shows all other incidents occurred in the downstairs bathroom.

Although the election of the offense incorrectly stated that the chosen offense was the incident before the last and occurred on or around January 19, 2009, we conclude that the detail contained in the election prevented the possibility of a "patchwork verdict." See Shelton, 851 S.W.2d at 137. We distinguish the instant case from State v. Johnny Lee Hines, in which this court dismissed the defendant's conviction for rape of a child. There, the State presented evidence that the defendant penetrated the victim daily except during the victim's menstrual cycle and when her parents were home. Johnny Lee Hines, slip op. at 3. Although the State presented no other evidence relative to the timing of the rapes, it elected the fifteenth of each month as the offense date. Id. This court dismissed the convictions because there was no proof for the jury to conclude that the rapes occurred on the fifteenth of each month. Id. slip op. at 7. The State presented the same evidence for every offense, which made the timing of the rapes in Hines critical because whether the victim was menstruating and whether the victim's parents were home determined if the defendant could have committed the rapes.

In the present case, the evidence shows that the last incident occurred on or about January 23, 2009, and the incident before the last occurred on or about January 19. The victim's testimony established that all of the facts contained in the election occurred only during the last incident. The date of the offense was not critical to proving the Defendant's guilt. The verdict could only have been based on the victim's testimony related to the last incident. We conclude that the incorrect reference to the second to the last incident did not deprive the Defendant of a unanimous jury verdict.

With regard to the sufficiency of the evidence, our standard of review on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This means that we may not reweigh the evidence but must presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the "credibility of the witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." State v. Dotson, 254 S.W.3d 378, 395 (Tenn. 2008) (citing State v. Vasques, 221

S.W.3d 514, 521 (Tenn. 2007)); see State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Relative to an election of offense, this court has said,

> [T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

Johnny Lee Hines, slip op. at 7.

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant, if the victim is more than three years of age but less than thirteen years of age." T.C.A. § 39-13-522. The record shows that the victim was eleven years old at the time of the incidents and that the incidents began in November 2008 and ended in January 2009. The victim said the Defendant tried to rape her on at least three occasions. The victim said the Defendant "tried" to rape her because the Defendant's penis was not fully inserted in her vagina. The victim said that the Defendant put petroleum jelly on his penis and the victim's vagina each time the Defendant inserted his penis in her vagina and that she was sore after each incident. The Defendant told the victim that the soreness would subside if she continued having sex with him for two weeks. The victim did not call for help during the incidents because she believed she could defend herself without help.

The evidence is sufficient to support the Defendant's conviction for rape of a child. Although the State elected the incident before the last and the corresponding date, this mistake did not create an environment for the jury to render a "patchwork verdict." Shelton, 851 S.W.2d at 137. The victim's testimony established that all of the facts contained in the election occurred only during the last incident, including the Defendant's penetrating the victim's vagina with his penis. The jury's verdict could only have been based on her testimony related to the last incident, and the Defendant was not prejudiced by the State's mistake. See State v. Ronald R. Smith, No. M2004-01457-CCA-R3-CD, Davidson County, slip op. at 9 (Tenn. Crim. App. June 29, 2005) (concluding that a discrepancy between witness testimony and the election of the offenses regarding the location of where the sexual assaults occurred was not significant and did not require reversal), perm. app. denied (Tenn. Dec. 5, 2005). The mistake was not so egregious as to warrant a reversal because the jury was not presented with an offense that combined elements of proof from two distinct

incidents. See id.; Shelton, 851 S.W.2d at 138; State v. Alfred Lee Middleton, No. W1996-00022-CCA-R3-CD, Shelby County (Tenn. Crim. App. Dec. 17, 1999). The Defendant is not entitled to relief.

## II

The Defendant contends that the trial court erred by allowing the victim to testify about a sexual assault that occurred in Louisiana. He argues that the testimony relative to sexual conduct in Louisiana was inadmissible propensity evidence under Tennessee Rule of Evidence 404(b). The State contends that although the record is unclear whether the victim testified about a sexual assault in Louisiana, if the victim did testify to such facts, the testimony violated Tennessee Rule of evidence 404(b). The State argues, though, that any error committed by the trial court was harmless. We agree with the State that the Defendant is not entitled to relief on this issue.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm'n Notes).

When relevant evidence reflects on the defendant's character, however, the trial court must apply the more rigorous standard of Tennessee Rule of Evidence 404(b). State v. James, 81 S.W.3d 751, 758 (Tenn. 2002); State v. DuBose, 953 S.W.2d 649, 655 (Tenn. 1997). Rule 404(b) prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. Id.; State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). The rule lists four requirements that must be satisfied before a court determines admissibility:

> (1) The court upon request must hold a hearing outside the jury's presence;

-20-

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issues, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). We review a trial court's ruling on evidentiary matters under Rule 404(b) using an abuse of discretion standard, provided the trial court has substantially complied with the procedural prerequisites of the rule. DuBose, 953 S.W.2d at 652.

At a jury-out hearing held about the victim's testimony that the Defendant touched the victim's vagina while the family was in Louisiana for Thanksgiving, the trial court found that the evidence was relevant as contextual background evidence and admissible because the conduct occurred during the period in the indictment, November 1, 2008 to January 25, 2009. The court said that if the evidence began to create confusion or the State attempted to charge the Defendant with an additional count of child rape, the court would reconsider its ruling. The court said that as long the State elected a particular incident, the evidence of other conduct or behavior by the Defendant was admissible. The court said the defense strategy of addressing the victim's recantation in the diary made it difficult for the court to rule any other way.

The record reflects that the victim did not testify at the trial about the Defendant's touching her vagina while in Louisiana. After trial counsel impeached the victim's credibility relative to her recantation in the diary, the trial court permitted the State to show the video recording of the victim's interview with Child Advocacy Center personnel. In the interview, the victim stated, in relevant part, that one night while her family was in Louisiana visiting her grandparents for Thanksgiving, she went into her mother and the Defendant's bedroom to ask her mother a question. She said, though, that she mistakenly approached the Defendant's side of the bed and that he grabbed her panties and rubbed her thighs and "private area." She said that he was on the telephone while he touched her, that he did not say anything to her because he was on the telephone, and that she did not say anything to him. The victim ran out of the bedroom.

Before the recording was played for the jurors, the trial court said that it wanted "to make sure that the jury understands that [the recording was] not being offered as substantive evidence. It just speaks to assess the victim's credibility and just listen to it and we'll go from there." After the recording was played, the trial court stated,

> Again, just as an instruction to the jury that this video was not being offered as substantive evidence. It [was] basically for you to see and assess the victim's credibility. It [was] not offered for the truth of the matter asserted, but basically for you to be able to look and see whether this testimony is corroborated from what you saw here that was taken at an earlier date, all right.

Although the video recording was relevant to the victim's credibility, the evidence was improper under Rule 404(b). The trial court found the evidence relevant as contextual background evidence because it occurred during the time period contained in the indictment. In State v. Gilliland, in our supreme court held that

> in terms of Rule 404(b), when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

22 S.W.3d 266, 272 (Tenn. 2000). Although the trial court allowed the State to show the recording because of the defense strategy of addressing the victim's recantation, the evidence was improper. Although the Louisiana incident occurred within the time frame in the indictment, it occurred outside this state's jurisdiction. There is no evidence to establish that the Louisiana incident was "so inextricably connected in time, place, or manner that the jury would be unable to comprehend the essential nature of the charged crime without hearing evidence of the 'other' crime." State v. Montgomery, 350 S.W.3d 573, 584 (Tenn. Crim. App. 2011) (citation omitted). The incident in Louisiana involved no penetration and no communication by the Defendant about the two-week time period. The Louisiana incident occurred while the victim's mother was lying next to the Defendant rather than while she was at work. The incident occurred in the bedroom as opposed to the bathroom. Also, the victim testified in detail about the incidents that occurred in Shelby

County and within the time frame listed in the indictment. We conclude that the trial court erred by allowing evidence of the Louisiana incident but that the error was harmless. Given the testimony of the victim, the social worker, and the nurse and the trial court's instruction that the recording was only to be used for assessing the victim's credibility, we cannot conclude that the error "more probably than not affected the judgment." See T.R.A.P. 36(b). The Defendant has failed to establish prejudice and is not entitled to relief.

The record shows that on direct examination, Ms. Wright testified that the only information the victim gave about Louisiana was that the Defendant first touched the victim around Thanksgiving 2008 while the victim's family was in Louisiana. Although this statement was in response to a question about whether the victim expressed a desire to live in Louisiana, the evidence was improper propensity evidence. We conclude, however, that the error was harmless. Ms. Wright's single comment was the only statement made by a witness at the trial regarding the events in Louisiana. There was no mentioning of the details of the Louisiana incident other than the Defendant's touching the victim, and there was no evidence of penetration. The victim testified in detail about the incidents that occurred in Shelby County, which included penetration. We cannot conclude that the error "more probably than not affected the judgment." See T.R.A.P. 36(b). The Defendant has failed to establish prejudice and is not entitled to relief.

### III

The Defendant contends that the trial court erred by allowing the victim's mother to testify that she saw a handgun in the Defendant's bedroom. He argues the testimony was irrelevant and inadmissible propensity evidence under Tennessee Rule of Evidence 404(b). The State contends that the trial court did not err by allowing the testimony about the handgun found in the Defendant's bedroom. The State argues that the Defendant opened the door to the testimony by cross-examining the victim's mother regarding the victim's recantation in her diary. The State concedes the mentioning of the handgun had little probative value, but argues any error was harmless. We agree with the Defendant, but we also conclude the error was harmless.

At the jury-out hearing, trial counsel addressed the State's intention to use evidence that Ms. Gary and the victim's mother saw a handgun in the Defendant's possession. He argued that the evidence was irrelevant because the State was not arguing that the Defendant used the handgun to force the victim to write the recantation in the diary. He also argued that the evidence would confuse and mislead the jury, that the evidence was highly prejudicial because it showed that the Defendant was violent, and that there was no probative value in mentioning the handgun. Counsel told the trial court that he intended to question the victim regarding the recantation in the diary, and as a result, the trial court

found the evidence admissible as contextual evidence and to show why the family moved from the home.

The record reflects that the victim's mother testified that during Easter weekend 2009, the Defendant would not allow her, the victim, or the victim's brother to leave their home. The victim's mother feared what the Defendant would have done had she tried to leave the home. She said the Defendant smashed her cell phone after she returned from Louisiana. The Defendant allowed the victim's mother to take the children to school on Monday morning. The victim's mother told Ms. Gary on Monday morning about the weekend's events. Ms. Gary and the police escorted the victim's mother home to gather belongings for herself and her children. The victim's mother said she went into the bedroom she shared with the Defendant to pack her belongings and saw a handgun on the night stand. She said the handgun was usually on the night stand and was for protection purposes. There was no evidence that the Defendant used the handgun during Easter weekend to prevent the victim's mother from leaving the home or that the Defendant used the handgun to force the victim to write the recantation in her diary.

The trial court allowed the testimony about the events of Easter weekend to show why the family was removed from the home. The record reflects, however, that the decision to move from the home was made before the victim's mother returned home with Ms. Gary and the police to gather belongings. When the victim's mother saw the handgun, she was packing belongings for herself, the victim, and the victim's brother. There is no evidence showing that the family moved from the home because the Defendant had a handgun on his night stand. The victim's mother testified that the handgun was usually in the same place and used for protection. We cannot agree that the mentioning of the handgun was probative of anything other than to suggest that the Defendant was violent.

We also disagree with the trial court's finding that the handgun was relevant to the victim's recantation. The handgun would only have been relevant to the victim's recantation if the victim saw the handgun or knew of its presence. There is no evidence to suggest the victim saw or knew of the handgun. The victim said numerous times that the Defendant did not force her to write the recantation. There is, likewise, no evidence that the Defendant threatened the victim with the handgun in order to force the victim to recant her allegations. Admission of the victim's mother's testimony relative to seeing the handgun was error. We conclude, however, that the error was harmless in light of the victim's mother's testimony that the handgun was usually on the night stand and used for protection and the victim's testimony that the Defendant did not force her to write the recantation. The testimony established that the Defendant did not threaten the victim's mother or the victim with the handgun at anytime. We cannot conclude that the error "more probably than not affected the judgment." See T.R.A.P 36(b). The Defendant is not entitled to relief.

# IV

The Defendant contends that the trial court erred by allowing the victim's mother to refer to herself as a hostage. He argues the testimony was irrelevant and inadmissible propensity evidence under Tennessee Rule of Evidence 404(b) because the victim did not testify that she was held hostage. He also argues that the testimony was irrelevant because it focused on the effect of the Defendant's actions on the victim's mother, not the victim. The State contends that the trial court did not err by allowing the testimony about the Defendant's holding the family hostage. The State argues that the Defendant opened the door to the testimony by cross-examining the victim's mother about the victim's recantation in the victim's diary.

At the jury-out hearing, the State told the court that the testimony about the Defendant's conduct on Easter weekend 2009 was offered to rehabilitate the victim's testimony about her recantation. The State conceded that the testimony was outside the scope of the indictment but argued that the victim's recantation was made as a result of the Defendant's actions on Easter weekend. Trial counsel objected to the admission of the testimony on the ground of inadmissible propensity evidence. Based on counsel's intention of questioning the victim about the recantation, the trial court found that the Easter weekend events were admissible and relevant background evidence related to the victim's recantation. The court said that if the evidence began to create confusion, the court would reconsider its ruling.

The victim's mother traveled home from Louisiana on Easter weekend with her children after the Defendant demanded their return. After she arrived, the Defendant smashed her cell phone, the only working telephone in the home. She felt threatened and afraid of the Defendant, who did not allow her or the children to leave the home until Monday morning. She said the Defendant's presence kept her from leaving the home. She contacted Youth Villages and the person with whom she spoke used the word hostage in describing the Defendant's preventing her from leaving the home. She decided to move from the home.

Although the Defendant was restrained from being physically near the victim, he was at the victim's home when the family returned from Louisiana. The victim said the Defendant told her that she needed to say "that none of this happened." The victim felt threatened and was scared of the Defendant. Although the victim's mother felt as though she were being held hostage, there is no evidence that the victim thought she was being held hostage. The victim said she wrote the recantation because the Defendant told her to convince DCS personnel that the rape allegations were false. The Defendant only told her to "make it happen." Although the victim testified that she was afraid of the Defendant, that

the Defendant was mean, and that she did not like the Defendant, there is no evidence that the victim wrote the recantation because the victim thought the Defendant was holding her hostage.

We cannot agree that the victim's mother's belief that she was being held hostage was relevant to the victim's credibility relative to her recantation. The trial court erred by admitting the victim's mother's testimony. We conclude, though, that the error was harmless in light of the victim's testimony that she was not forced to write the recantation. The victim said that after the Defendant told her to convince everyone that she had lied, she went to her bedroom and stayed there. The victim's testimony did not establish that she thought she was a hostage or that the Defendant held her hostage until she convinced DCS that she had lied. Also, the victim testified in detail about the incidents involving the Defendant's penetrating the victim with his penis. We cannot conclude that the error "more probably than not affected the judgment." See T.R.A.P. 36(b). The Defendant is not entitled to relief.

Although not treated as a separate issue, the Defendant argues that the trial court erred by failing to conduct a pretrial hearing relative to the evidence addressed in sections II, III, and IV. He argues that in order for evidence of other crimes, wrongs, or acts to be admissible, the court must conduct a hearing outside the presence of the jury, make a finding that the proof is clear and convincing, and exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. The State does not address the Defendant's argument.

Tennessee Rule of Evidence 404(b)(1) only requires the trial court to hold a hearing outside the presence of the jury "upon request." In any event, the record reflects that the trial court held a motion hearing with regard to the evidence at issue in sections II, III, and IV and that the Defendant argued the evidence was inadmissible under Tennessee Rule of Evidence 404(b). At the hearing, counsel did not dispute the substance of the testimony of the witnesses and only argued that the witnesses should not be allowed to testify about the respective subject matters. Likewise, the Defendant did not object to the court's not hearing proof regarding the evidence. See Tenn. R. Evid. 103(a)(1). This contention is without merit.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE