IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 10, 2020 Session

## STATE OF TENNESSEE v. VICTOR VALLE

**Appeal from the Criminal Court for Shelby County**
No. 17-03946      James M. Lammey, Judge
_____

### No. W2019-01767-CCA-R3-CD
_____

A jury convicted the Defendant, Victor Valle, of rape of a child, and he received a sentence of twenty-two years of incarceration. On appeal, the Defendant challenges the sufficiency of the evidence and the trial court's ruling admitting the victim's testimony that the Defendant had abused her outside of the time period specified in the indictment. We conclude that the evidence is sufficient and that the trial court did not abuse its discretion in admitting evidence of prior bad acts, and we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Joseph McClusky (on appeal); and Edwin Lenow and John Dolan (at trial), Memphis Tennessee, for the appellant, Victor Valle.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lessie Rainey and Cavett Ostner, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Defendant was indicted in 2017 for rape of a child committed against the victim, his niece, between August 24, 2002, and October 12, 2005. The first date listed in the indictment was dictated by the statute of limitations for the offense and reflects a date fifteen years prior to the return of the indictment. Although the State could not charge

the Defendant with offenses committed prior to this date, the allegations included abuse which began in 1998. The closing date charged in the indictment was dictated by the victim's thirteenth birthday.

Prior to trial, the Defendant moved to dismiss the charge based on the statute of limitations and based on a violation of his right to a speedy trial. The State filed a notice that it intended to introduce evidence of prior bad acts committed by the Defendant under Tennessee Rule of Evidence 404(b). The State asserted that the Defendant sexually abused the victim beginning in 1998 and that the victim should be able to testify that the abuse was ongoing from that time. The State asserted that the victim's response to the abuse, and in particular, her delay in reporting the abuse, could not be understood without a reference to the period of time prior to that charged in the indictment, and the State argued that the testimony would be necessary for contextual background and relevant to the victim's credibility. The trial court held a hearing at which the victim testified, and the court agreed that the evidence was necessary for contextual background, to complete the story of the crime, to show a settled purpose to harm the victim, and because it reflected on the victim's credibility. The trial court determined that prior bad acts had been proven by clear and convincing evidence. The court noted that the victim would only be permitted testify to the particulars of abuse that occurred during the indictment timeframe and concluded that the probative value of the evidence substantially outweighed the danger of unfair prejudice. In further discussion, the court inquired whether the testimony of events prior to 2002 would be general, and the prosecutor assured the court that the testimony would keep to "generalities."

During opening statements, the defense asserted that the Defendant had lived with the victim's family but had left Memphis in 2001. The defense stated that when he returned in 2003, he no longer resided in the home. The defense noted that the proof would show that the Defendant "was not in the house — except for family gatherings" during the time period covered by the indictment. The defense also argued that the victim had fabricated the abuse and that she did not make any allegations of abuse until "almost twenty years" after the abuse began.

The victim, who was twenty-six years old at the time of trial, testified that the Defendant, her mother's brother, came to live with her family in Memphis around 1998, when she was about six years old. The victim's family, which included her parents, her younger sister, and the Defendant, lived in a three-bedroom, one-bathroom home. The victim's father was frequently absent from home for work.

The Defendant initially slept in the second bedroom, while the victim and her sister slept in the master bedroom with her parents. The third bedroom was occasionally occupied by men who worked for her father or by two more of the victim's uncles.

Although the second bedroom and the master bedroom were connected by a door, the victim testified that the second bedroom also had a door which led to the living area. The victim testified that she thought that bunk beds were moved into the second bedroom around 2001.

The victim's father confirmed that the family lived in Memphis and that the Defendant lived with them while the Defendant was in middle school and high school. The victim's father testified that he was in charge of the work force for a construction company, and he was frequently absent from his home when working in Memphis and also frequently out of town to supervise long-term projects. The household consisted of the victim's father and mother, the victim, and her younger siblings. Three of the victim's maternal uncles resided with the family at various times. The victim's father testified that the Defendant "always stayed there."

The victim testified that the Defendant began to touch her inappropriately almost immediately after he moved into the home. She testified that the abuse consisted of the Defendant repeatedly penetrating her vagina with his fingers, penetrating her anus, and performing oral sex on her. She recalled the first time it happened, the Defendant was throwing her up in the air, then started moving her in circles through the air and put his fingers into her underwear. She asked him to put her down and watched carefully as he played with her younger sister. Although she was "determined to tell" if she saw the Defendant do the same thing to her sister, she did not tell anyone what the Defendant had done to her because the Defendant did not assault her sister.

The Defendant lived with the family until after the victim's baptism on June 18, 2000. The victim was able to recall this date because she was beset by a worry that the Defendant's abuse meant that she was committing adultery and that Jesus would not love her. She was excited at the thought that her sins would disappear with her baptism, but the abuse continued. The Defendant left briefly but returned to live with the family sometime after May 12, 2001, which was the date of the victim's first communion. The victim was able to recall this date because she had been told she could not take first communion without confessing her sins. She accordingly told a priest about the abuse, but the priest took no action. The victim felt she was able to "start again" after confessing prior to her first communion. However, the Defendant returned to Memphis after the victim's first communion and began abusing her again. She specified that she recalled that the Defendant was not living with the family in May during her first communion but that he was living there during September 11, 2001. He left shortly thereafter to go to Houston.

The victim testified that in addition to telling the priest and her aunt, who was also a child and only one year older than the victim, she attempted to tell her mother and

grandmother about the abuse when she was around nine years old and in Houston for Christmas. At this time, the Defendant was living in Houston with the victim's grandmother. The victim told her mother and grandmother, "[The Defendant] touched my butt," but she did not elaborate because she was worried that she had interrupted their conversation. The victim's mother did not ask her questions about her statement or take any action to stop the abuse. The victim testified that she did not have an open relationship with her mother and that her mother had raised the Defendant as a son.

When the victim was eleven years old, around 2003 or 2004, the Defendant returned to live in the victim's home. At this time, he slept on a couch in the living room, and she slept in the second bedroom. The Defendant continued to abuse her. Sometimes, he would play pornographic videos on the television in the living room in the early morning hours, and then go into her bedroom, from which the television could be seen through the open door. He would slide under her bed and penetrate her vagina with his fingers. She testified the bed was about twelve inches off the floor.

The victim testified about a specific instance of abuse which took place in April or May 2004. At that time, the victim had read about girls her age being impregnated by relatives, and she was afraid she would suffer the same fate. The victim recalled that on one occasion, the Defendant pushed her into the bathroom and performed oral sex on her. After he stopped, she told him, "No, this isn't happening anymore. Like, I'm done — like, no." The Defendant responded that he would only stop assaulting her if she would take pictures of her genitals and breasts using his flip phone. The victim took the pictures, but the Defendant was dissatisfied with their quality and told her to take different pictures. The victim warned the Defendant that she was going to tell her mother. She testified that it was a mistake to give him the warning, because he immediately took the pictures to the victim's mother and told the victim's mother that he had found them on his cell phone and did not know why the victim had put them there. Although the victim responded by telling her mother about the continuous abuse, the victim's mother did not believe her.

The victim did not know where the Defendant lived after he left the home in 2004, but she was certain he lived there in 2004. She testified that he left around June, which she recalled because she started her period soon after. She agreed that she attended the Defendant's wedding but noted that it was a Muslim wedding where the men and women were in separate rooms for the reception. She identified a picture of herself at the wedding with members of her family, the Defendant's wife, and the Defendant. She did not recall if the Defendant worked during high school.

The victim testified that she never told her father about the abuse because she was afraid that her father would shoot the Defendant and end up in prison. She likewise did not tell her teachers.

The victim's father testified that the Defendant moved out of the home "probably around 2005" and agreed that the Defendant lived with the family "from before he entered high school until around 2005." On cross-examination, he agreed that the Defendant sometimes lived in Texas but stated that the Defendant always returned to the victim's family's home.

The victim's father testified that he knew nothing about the abuse at the time it was occurring. He recalled that he told the Defendant to move out of the home because there were arguments, because the Defendant "wrecked a truck," and because the Defendant was doing things the victim's father did not like. He elaborated that the Defendant allowed one of his brothers and the victim's mother to take the blame for wrecking the truck.

The victim described the circumstances of deciding to pursue charges. She testified that in 2013, she was home from college and found the Defendant in her mother's store. She confronted him about his abuse, calling him a pedophile, and the Defendant responded, "Why are you so angry? You act like you didn't have a choice in that. You act like you didn't make the choice to participate in that. You wanted that." At this point, the victim demanded for her mother to essentially choose between the victim and the Defendant and to cut off all ties with the Defendant by not allowing him into the home. In 2016, the victim had returned home for a visit and found out from her sister that her mother was continuing to maintain a relationship with the Defendant and continuing to invite him to the home. She decided to go to the police because she realized her mother would not make her own home safe for her. The victim did not recall if she said during her police interview that she never disclosed the abuse, but on reviewing her statement to police, she noted that the statement included the sentence, "I decided to tell my mom and grandma, but they didn't believe me." She agreed that the disclosure of the abuse to the priest was not in the statement.

Memphis Police Sergeant Jason Battle confirmed that the victim reported the abuse to law enforcement and that she made a statement. He testified he tried to reach out to the victim's mother but that she did not give a statement. He agreed on cross-examination that he would have included in the written statement any information that the victim had told a priest about the abuse. Sergeant Battle also agreed that he believed the victim told him that she had not revealed the abuse while it was happening because she was scared. On redirect examination, however, he was shown the victim's statement and observed that it included the assertion, "We decided to tell my mom and grandma,

but they didn't believe us." He also agreed that the victim had said she was "too scared" to tell her father because she was "afraid he might kill" the Defendant.

The Defendant's ex-wife, Dr. Thekrayat Khader, testified on his behalf, attempting to show that the victim had spent time in the Defendant's company when she was older. She testified that the victim attended their wedding in 2009. On another occasion, after the wedding, Dr. Khader cooked a meal for the Defendant's family and the victim was among those who came to their home. The victim seemed friendly. Dr. Khader also testified that the Defendant left Memphis in 2001 and lived in Texas. When he returned in 2003 or 2004, he lived in an apartment complex where a friend of Dr. Khader's also lived and did not live at the victim's home. Dr. Khader also testified that the Defendant was a good father to their three children and cared for the children while she was in medical school. Dr. Khader was asked on direct examination, "[D]id you ever have any complaints from your children that [the Defendant] had done anything inappropriate? — sexually inappropriate?" Dr. Khader responded, "Absolutely not. No. I would have been devastated." On cross-examination, she agreed that she took her eldest daughter to a Rape Crisis Center for an evaluation after the child made a complaint about the Defendant after listening to a presentation at school regarding inappropriate touching. On redirect examination, she testified that the issue was resolved in the Defendant's favor.

The victim's mother also testified for the defense. She stated that the Defendant came to live with the family in May 1998 and returned to Texas in 2000. She elaborated that he stayed in Houston in 2000 but returned to graduate high school in Memphis. His graduation took place in June 2001. The victim's mother testified that the Defendant was not in the home on September 11, 2001, and that he never lived in the house again. While she agreed that the Defendant worked for the victim's father around 2003, the victim's mother denied that he lived in the home at the time. She testified that he was engaged and living with a woman in 2004 and that they had a child in 2006. According to the victim's mother, the Defendant worked and did not "come around with" the family "too much."

The victim's mother gave testimony tending to show that the Defendant would not have had access to the victim or to her bedroom. She testified that "some guys" stayed in the third bedroom of the home, that the only place the Defendant ever slept was the pull-out couch in the living room, and that the children stayed in the second bedroom. According to the victim's mother, the second bedroom had a door leading to the living area, but that door was blocked off by a set of bunk beds. She testified that this setup did not vary from 1998 to 2004 or 2005. According to the victim's mother, the only way to enter the victim's bedroom would have been through the master bedroom. The victim's

mother also testified that the bed on which the victim slept was only six inches off the floor.

The victim's mother testified that the Defendant worked at Burger King five days each week and that when he worked on weekdays, he went to work straight from school and would not return home until 10:00 or 11:00 p.m. She denied that the Defendant was watching pornography at the house and testified she would have been aware of that fact. She never found pornography in the house.

The victim's mother acknowledged that the victim approached her to tell her that the Defendant was sexually abusing her. The victim's mother testified that the victim complained she was being molested "[o]nly one time," in 1999. She gave testimony consistent with the victim's that the victim told her, "[The Defendant] touched my butt." She testified that the victim did not elaborate and that the Defendant denied it. She asked the Defendant to leave the room in which the children had been playing. The victim's mother felt she paid attention to this allegation "as much as [she] needed to" and felt she had taken precautions to protect the victim by making her bedroom inaccessible.

The victim's mother also testified consistently with the victim's testimony that in 2004, the Defendant came to her and showed her pictures of the victim naked on his phone. When questioned about the photographs, the victim said that the Defendant was sexually abusing her and had forced her to take the photographs. The Defendant denied this, and the victim's mother decided to take the victim to a doctor and psychiatrist. The victim's mother testified that she told the victim's father about the photographs and that he "couldn't believe it." She stated she was unsure at the time if the victim had been sexually abused and was still unsure. The victim's mother confirmed that there was a confrontation in her store in 2013.

No one from the victim's school or church ever told the victim's mother that the victim had made allegations of abuse. However, she agreed that a priest could not repeat things told to him in confession. The victim's mother stated she had a good relationship with the victim. She thought the interactions between the victim and the Defendant appeared normal. She confirmed that she had essentially raised the Defendant as her son because she was his eldest sister and their mother had left the home.

In rebuttal, the victim's sister testified that she and the victim stayed either in their parents' bedroom or in the second bedroom. She testified that, contrary to what the victim's mother had stated, the door to the living area was not blocked off for the entire time the girls slept in the second bedroom. She recalled periods of time during which she slept in the room and the door was not blocked. She testified consistently with the victim that the Defendant had stayed sometimes in the second bedroom and sometimes in the

- 7 -

living room or third bedroom. The victim's sister also confirmed that there was pornography in the home. She specifically testified that she knew there were pornographic magazines and videotapes in the third bedroom at a time when the Defendant and another of her uncles lived there. On a few occasions, the victim's sister found pornographic magazines under her pillow or under the covers in her bed. She returned these to the third bedroom, where she thought they were kept. The victim's sister never told anyone about the pornography. She testified that she felt her mother would not believe her and that her father would start an altercation if he knew. The victim's sister also stated that she had never developed a relationship with the Defendant because the victim "would tell me to stay away; and she would just say that it wasn't safe." The victim never elaborated to the victim's sister the reasons she thought the Defendant was unsafe.

The victim's father was also called to rebut the victim's mother's testimony. He agreed that the door from the second bedroom to the living room was not always blocked off by furniture and that the Defendant at various times stayed in the second bedroom, the third bedroom, or the living room. The victim's father also vehemently denied that his wife had ever made him aware of any allegations of sexual abuse. He was aware the victim was taken to a psychiatrist, but the victim's mother told him it was because there were problems with her behavior. He never saw the photographs of the victim on the Defendant's cell phone. He stated he would probably have done "something very bad" if he had known, and he elaborated, "All this crap, I didn't have [any] clue about it. Okay. I wish I knew this before. We would not be here."

The State elected to rely on the victim's testimony that the Defendant pushed her into the bathroom and performed oral sex on her in the spring of 2004. The prosecutor noted that the other incidents "are for you to consider when you think about whether the witnesses are telling the truth, the concept, and for you to have the whole picture" but emphasized that the jury "must consider just the one incident that we elected for you to consider when you're considering the guilt or innocence of the defendant." The jury was instructed to "consider only this alleged act in deciding whether or not the [D]efendant has been proven guilty beyond a reasonable doubt."

The jury found the Defendant guilty of rape of a child. He was sentenced to serve twenty-two years in prison. The Defendant appeals, challenging the sufficiency of the evidence and the trial court's decision to admit the victim's testimony regarding the abuse outside the dates identified by the indictment.

# ANALYSIS

## I. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to sustain the verdict because the proof was based on the victim's testimony and the victim's mother contradicted some of the victim's testimony. Because there was evidence from which the jury could have found all of the elements of the crime beyond a reasonable doubt, the evidence was sufficient.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we give the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277.

The Defendant was charged with rape of a child. To convict the Defendant, the State had to establish "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim," and that the victim was less than thirteen years old. T.C.A. § 39-13-522(a) (2004). Sexual penetration includes cunnilingus. T.C.A. § 39-13-501(7) (2004). There was no dispute that the victim was eleven years old at the time that she alleged the Defendant pushed her into the bathroom and performed cunnilingus on her. The victim's mother, having failed to act on the allegations of sexual assault that the victim brought her when the victim was nine and eleven years old, attempted to cast doubt on the victim's credibility at trial by testifying that the door to the victim's room was barricaded and that the Defendant was not staying with the family in 2004. This testimony was contradicted by testimony from the victim, the victim's sister, and the victim's father that the door was not continuously barricaded. The victim and the

victim's father both testified that the Defendant was living with the family in 2004. The victim's mother confirmed the victim's testimony that she had twice during her childhood told her mother that the Defendant was sexually assaulting her. As the Defendant acknowledges, this case turned on the credibility of the witnesses, and this court will not disturb the jury's finding that the victim was credible. Accordingly, the evidence was sufficient.

## II. Tennessee Rule of Evidence 404(b) Testimony

The Defendant asserts that the trial court committed reversible error by allowing the victim to testify about abuse that occurred outside of the timeframe charged in the indictment. We conclude that in this particular case, the absence of the evidence would have created a chronological or conceptual void in the State's case, and that the evidence was accordingly properly admitted for contextual background.

Prior to trial, the trial court held a hearing outside the jury's presence to determine the admissibility of the evidence. During the hearing, the victim testified consistently with her trial testimony that she lived with her mother, father, and sister when she was six and that the Defendant began to abuse her almost immediately after he moved into the home. She stated that the Defendant would put his fingers in her underwear and "molest" her "literally anywhere" they were alone. She testified that he moved out for a period of time when she was around eight but returned to live with the family when she was nine or ten and stayed there until she was eleven. The victim testified that she tried to tell her mother about the abuse when she was around ten, in 2002, but her mother did not help her. She testified consistently with her trial testimony regarding the Defendant's coercing her into taking the photographs on his cell phone. She stated the photographs were taken when she was around eleven years old, in 2003 or during spring 2004.

The State argued that the victim's willingness to take the photographs and her delay in reporting were explained by the prior abuse and the victim's mother's failure to take action when the victim attempted to report the abuse. The State noted that excluding the evidence would unfairly and adversely reflect on the victim's credibility and argued that without the information, the jury would be confused. The Defendant argued that the evidence was inadmissible propensity evidence. The trial court concluded that the evidence was relevant to material issues including a settled purpose to harm the victim, to "complete the story of the crime," and as contextual background. The trial court found the proof to be clear and convincing, and concluded that the probative value of the evidence outweighed any unfair prejudice. The trial court noted, and the prosecutor agreed, that the testimony of events outside the time period of the indictment would be kept to generalities.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). This is to prevent the jury from convicting the defendant of a crime based on propensity rather than proof the defendant committed an offense. *State v. Garrett*, 331 S.W.3d 392, 402 (Tenn. 2011) (citing *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)). In evaluating the admissibility of evidence regarding prior bad acts, the trial court must adhere to the following procedure:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). When a trial court has substantially complied with the procedures of Rule 404(b), this court will only reverse the admission of evidence if there has been an abuse of discretion. *State v. Hawkins*, 519 S.W.3d 1, 45 (Tenn. 2017).

Here, the court held a hearing outside the jury's presence and determined that the evidence was relevant to material issues other than propensity, including a settled purpose to harm the victim, to "complete the story of the crime," and as contextual background. The trial court found the evidence to be clear and convincing and found that the probative value outweighed any danger of unfair prejudice. Accordingly, our review is for abuse of discretion. *See Hawkins*, 519 S.W.3d at 45.

In general, a court should take a restrictive approach to admitting evidence under Rule 404(b) because of the potential that the jury will be unfairly influenced. *State v. Dotson*, 450 S.W.3d 1, 76 (Tenn. 2014). Rule 404(b) is one of exclusion, meant to ensure that a jury does not improperly convict a defendant based upon "his or her bad character or apparent propensity or disposition to commit a crime," rather than on the strength of the evidence presented at trial. *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). This potential is particularly great when the bad acts are similar to the offenses charged. *Id.* There is no "sex crimes exception" that makes evidence admissible "for the purposes of corroboration, or to show the intimate relations between the parties, or to show that the defendant had a lustful disposition." *Id.* at 828-29. However, there is a

- 11 -

narrow exception permitting "'evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment,'" in order to permit the prosecution of sexual offenses against children who may not be able to identify the dates on which offenses were committed. *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016) (quoting *Rickman*, 876 S.W.2d at 828). Because the challenged prior assaults in this case were not within the indictment time period, *Qualls* does not apply. The Defendant does not challenge the victim's testimony regarding other assaults within the indictment timeframe.

Instead, the trial court admitted the evidence because it found the evidence relevant to other material issues. Evidence is relevant to a material issue other than propensity if it bears on motive, identity, intent, continuing scheme or plan, or to rebut a claim of accident, mistake, or entrapment. *State v. Jarman*, 604 S.W.3d 24, 48 (Tenn. 2020); *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013). Furthermore, "evidence offered to show contextual background need not be excluded simply for the reason that it involves evidence of prior acts." *State v. Gilliland*, 22 S.W.3d 266, 271 (Tenn. 2000). "If the contextual evidence is relevant to an issue other than criminal propensity and its probative value is not outweighed by the danger of unfair prejudice, then that evidence may be properly admissible." *Id.* General background evidence is "rarely probative of an actual material issue at trial." *Id.* However, such evidence may be "crucial to understanding the other material evidence at trial, and the absence of background evidence could have detrimental effects on the jury's comprehension of the offense in question." *Id.* at 272. Accordingly, such evidence is admissible "when exclusion of that evidence would create a chronological or conceptual void in the presentation of the case and that void would likely result in significant jury confusion concerning the material issues or evidence in the case." *Id.* (footnote omitted). The evidence may not be admitted unless:

> (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

*Id.*

This court has held that evidence of sexual activity between a defendant and victim which occurred prior to the indicted offense was admitted in error when the evidence was not "'so inextricably connected in time, place, or manner that the jury would be unable to comprehend the essential nature of the charged crime without hearing evidence of the "other" crime.'" *State v. Montgomery*, 350 S.W.3d 573, 584 (Tenn.

- 12 -

Crim. App. 2011) (quoting Cohen et al, *Tennessee Law of Evidence* § 4.04[13] (5th ed. 2005)); *see also Rickman*, 876 S.W.2d at 829-30 (testimony of unindicted sexual offenses against a minor were not admissible as corroboration of the minor's testimony); *State v. Bruce Turner*, No. W2010-02513-CCA-R3-CD, 2012 WL 12303681, at *15-16 (Tenn. Crim. App. May 25, 2012) (concluding that testimony about sexual abuse occurring outside the state was improperly admitted because it was not so closely tied to the crime that the jury would be unable to comprehend the charged offense, but finding the error harmless); *see also State v. Woodcock*, 922 S.W.2d 904, 911-12 (Tenn. Crim. App. 1995) (the State conceded error in introducing graphic testimony regarding uncharged conduct and the error was not harmless due to the extensive and graphic nature of the testimony).

On the other hand, this court has declined to find that a trial court abused its discretion in admitting such testimony when it is necessary to establish essential contextual background or relevant to the victim's actions in disclosing or delaying disclosure of the abuse. In *State v. Rickey Bell*, the victim was permitted to testify to sexual abuse occurring prior to the indicted crime. No. W2014-00049-CCA-R3-CD, 2015 WL 846745, at *1-2 (Tenn. Crim. App. Feb. 26, 2015). This court concluded that the prior sexual abuse was necessary as contextual background because the victim had revealed the prior abuse to her mother, the defendant had been convicted of misdemeanor assault, and the victim had experienced guilt and blame from having made the prior report. *Id.* at *13. "Had the victim been prohibited from explaining the reasons for her delay as they related to the [earlier assault] case, this would have created a conceptual void in the State's case that likely would have resulted in significant jury confusion over the issue." *Id.* Likewise, in *State v. Robert Allen Zaloba*, the victim was permitted to testify briefly that he overheard something that led him to believe that the defendant was sexually involved with another person. No. M2011-00855-CCA-R3CD, 2012 WL 6690027, at *16 (Tenn. Crim. App. Dec. 26, 2012). This court concluded that although the offenses against the other child victim had been severed, the victim was properly allowed to testify to these general facts because his belief that the defendant was molesting another child led him to disclose the abuse and because excluding the testimony would interfere with the jury's understanding of the context of the case. *Id.* at *16-17; *see also State v. Travis Smith*, No. W2015-02360-CCA-R3-CD, 2017 WL 1959500, at *13 (Tenn. Crim. App. May 11, 2017) (bad act evidence was relevant to the motivation for the victim's disclosure); *State v. Larry Michael Berkley*, No. W2015-00831-CCA-R3-CD, 2016 WL 3006941, at *10-11 (Tenn. Crim. App. May 17, 2016) (evidence of a news report of the defendant's arrest was relevant to the victim's credibility because it explained the timing of the victim's disclosure and because excluding the evidence would have created a conceptual void regarding what prompted the victim's mother to question him); *State v. Christopher Bailey*, No. W2014-02434-CCA-R3-CD, 2016 WL 7742753, at *7 (Tenn. Crim. App. Apr. 8, 2016) (concluding that it was error to admit evidence of a prior aggravated sexual battery on the basis that it was

- 13 -

relevant to show lack of mistake or intent, but concluding the error was harmless because the evidence was relevant to explain a delay in reporting or the timing of disclosure); *State v. David E. Offutt*, No. M2007-02728-CCA-R3-CD, 2009 WL 2567870, at *12 (Tenn. Crim. App. Aug. 20, 2009) (the victim was properly permitted to testify in general terms regarding instances of sexual abuse by the defendant in another county because the contextual evidence was relevant to explain the victim's failure to leave when given an opportunity).

Here, the Defendant's theory of the case was that the victim had fabricated the accusations after the passage of a significant amount of time, that the Defendant could not have committed the offense because he was not living in the home during the time period covered by the indictment, and that the Defendant did not have access to the victim because her door was barricaded and because he was frequently at work. The victim testified that the Defendant moved into her home at the time she was six years old and that he almost immediately began to sexually abuse her. When the victim was around nine, she attempted to reveal the abuse to her mother and grandmother, but her mother took no action to protect her. She also revealed the abuse to a priest because she was worried that she was committing a sin, but this disclosure also resulted in no action. The Defendant moved away from the victim's home in 2001, prior to the time period covered by the indictment. Although the victim's mother testified that the Defendant did not return to the home during the time period covered by the indictment, the victim testified that the Defendant was living in the home in spring 2004, and her father corroborated her testimony. The victim recalled that after the Defendant returned, he continued to sexually abuse her, and she testified regarding an occasion where he forced her into the bathroom and performed oral sex on her. The State relied on this incident to establish the elements necessary to obtain a conviction. When the victim resisted, the Defendant told her he would stop assaulting her if she took nude photographs, which she did. When the victim refused to take further photographs and threatened to tell her mother about the abuse, the Defendant showed the pictures to the victim's mother and told the victim's mother the victim had taken them on her own. The victim's mother confirmed that the victim, when confronted with the photographs, told her that the Defendant was sexually abusing her, and the victim's mother likewise confirmed the victim had complained about sexual touching when she was nine.

Relevant evidence is evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In this case, the victim's prior disclosures to her mother, grandmother, and priest had resulted in no cessation of the Defendant's assaults. Accordingly, the testimony about the prior assaults and disclosures explains the victim's acquiescence in taking the photographs, her reluctance to disclose the abuse to her mother (again), and the lengthy delay between the

- 14 -

offense and the prosecution. Furthermore, the jury would have had difficulty understanding the timeline of events or determining whether the victim was mistaken about the timing of the rape without the victim's testimony that the Defendant lived with her and abused her both prior to 2001 and again beginning in 2003 or 2004. We conclude that in this case, prohibiting the victim from testifying about prior abuse would have left both a chronological and a conceptual void in the State's case.

We note that we agree with the reasoning in *Rickey Bell*, 2015 WL 846745, at *13, that the evidence was not relevant to show a settled purpose to harm the victim because the Defendant's identity, intent, and motive were not contested issues at trial. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993) (admitting evidence of prior violence against the murder victim to show motive, malice, intent, and a settled purpose to harm).

The Defendant also asserts that the trial court erred in balancing the probative value with the prejudicial effect of the evidence. "'Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) (quoting *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998)). Evidence is unfairly prejudicial when it has "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily[,] an emotional one.'" *State v. Shermond Dewayne Dillard, Jr.*, No. M2018-02268-CCA-R3-CD, 2020 WL 1897167, at *5 (Tenn. Crim. App. Apr. 16, 2020) (quoting *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978)). The danger of unfair prejudice is increased if the prior bad act was similar to the crime at issue at trial. *State v. Adams*, 405 S.W.3d 641, 659 (Tenn. 2013).

Here, the evidence of the prior sexual abuse and prior disclosure of abuse was relevant to explain the victim's reluctance to disclose the offenses, her willingness to take photographs, and the delay in commencing prosecution. It was also relevant to rebut the Defendant's insinuation that the victim was incorrectly remembering the dates during which the Defendant lived in the home. The victim testified regarding the first time the Defendant assaulted her but did not give any details of other offenses outside the indictment period. While the other offenses had some prejudicial value, the testimony was not graphic, and the conviction ultimately hinged on the jury's assessment of the victim's credibility. Furthermore, any prejudicial impact was diminished by the victim testifying to other, unchallenged instances of sexual conduct occurring during the period charged in the indictment. We conclude that the trial court did not err in determining that the probative value was not outweighed by any prejudicial impact.

**CONCLUSION**

Based on the foregoing analysis, we affirm the trial court's judgment.

_____

JOHN EVERETT WILLIAMS, PRESIDING JUDGE